To:     Associate Dean Beverly Anderson[1]

From:   ███████ ███████

Date:   June 23, 2016

Re:     Appeal of Title IX Hearing Panel Decision

---

A.  **Introduction**

As detailed below, I never assaulted ███████ ███████ in any way. As a result, I believed the College would clear my name because the College's Sexual Misconduct Policy ("SMP") guaranteed me an "adequate, reliable, and impartial investigation. . . ." *See e.g., Exhibit 1,* pgs.2-3 (quoting SMP§ XII). Instead, the College subjected me to an inadequate, unreliable, and biased investigation which resulted in my unlawful discipline.

Evidence of the College's violations of my SMP and Title IX rights include the fact that the preponderance of the evidence points to only one reliable conclusion - that ███████ allegations against me are false. For example, the evidence of my innocence includes the following six pieces of undisputed evidence:

1.  The hearing panel members ("Hearing Panel") determined ███████ dishonestly alleged that I "physically held" her "down and prevent[ed] her from leaving [my] room"; *Exhibit 1,* p.140 (containing the Hearing Panel's findings);

2.  The Hearing Panel agreed ███████ allegations that I forced her to engage in "non-consensual kissing" were false; *Id.*;

3.  Despite ███████ allegations to the contrary,[2] a polygraph expert determined: (1) I did *not* force ███████ to perform oral sex on me; (2) ███████ did *not* push my head away when I performed oral sex on her; and (3) ███████ did *not* appear to me to be under the

---

[1] I address this appeal to you because Columbia College ("College") did not provide me "the name of the Appeals Officer" as required by SMP §XIV(D)(8). If the appeal needs to be sent to someone other than you, please let me know who to send it to and I will do so.

[2] *See, Exhibit 1,* p.133 (containing College Investigator Sarah Shaaban's ("Investigator Shaaban") report which states ███████ alleged – on one hand – that her voluntary consumption of alcohol caused her fade "in and out of consciousness" and caused her to experience "long [periods of] time where she doesn't remember" what happened. But on the other hand, ███████ alleged remembering that: "Respondent 'pushed her down' and made him give him oral sex. She then stated he gave her oral sex and that she was trying to push him away . . . [s]he stated [when he was forcing her to perform oral sex] she kept trying to push him away and he pushed her head back down on his penis . . . [s]he also mentioned she had bruises on both shoulders . . . [s]he believed the bruises . . . were from him holding her down.").

1

**Complaint Exhibit A, page 1**

influence of alcohol or drugs. *Exhibit 2* (containing Polygraph report presented to Hearing Panel);

4. Dr. Gary Lage - a toxicologist expert - proved ▓ falsely claimed she was so incapacitated that she was fading "in and out of consciousness." *Compare, Exhibit 1*, p.100-104 (containing report of toxicologist expert Dr. Gary Lage) with *Id.*, p.133 (containing ▓ statements about fading "in and out of consciousness.");

5. Three students provided sworn affidavits stating ▓ did not manifest signs of incapacitation when they observed her shortly before she claims alcohol caused her to fade "in and out of consciousness." *See generally, Exhibit 3* (containing said affidavits which were presented to Hearing Panel); and

6. ▓ repeatedly provided contradictory testimony which included, but was not limited to:

    a. On one hand, telling the Hearing Panel that she felt her "responses [to me] were unclear or very passive . . . <u>I never completely said the word no</u> . . ."[3] – while on the other hand – telling Investigator Shaaban that she made "repeated requests for the sexual interaction to stop." *Exhibit 1,* p.83 (containing May 6, 2016 Charge Letter from Asso. Dean Anderson to Respondent); and

    b. Admitting that the morning after she claims I assaulted her with enough force to leave bruises on shoulders, she sent me a text message stating she had "good time" with me the night before. *Exhibit 1*, p.133 (containing ▓ statements regarding same). When I raised this point in the hearing, ▓ explanation was that "I realized like after I sent it that I really didn't have a good time with him, and I wasn't really thinking when I sent that text." *Hearing Audio* at 50:46. However, ▓ also stated that she "asked her friends what she should say" when responding to the text message. *Exhibit 1*, p.133; *see also Hearing Audio* at 48:44 (containing a similar statement). The statement that she "wasn't really thinking" is inconsistent with the idea that she had discussed her response with her friends. More importantly, if I had truly assaulted ▓ with such force that she had bruises, it seems unlikely that she would have to think about whether she had had a good time.

These undisputed facts should have called into question ▓ testimony, but were disregarded by the Hearing Panel. As detailed in my pre-hearing written statement, one explanation for ▓ false allegations is that I hurt her feelings by declining her offer to have sexual intercourse. *Compare, Id.,* p.69 (containing Respondent's April 25, 2016 written statement), with *Id.,* p.133 (containing ▓ statements about asking me to put on a condom). And while you may want to reject this explanation, academic studies suggest a high percentage of false allegations stem from things like retribution for a real or perceived wrong, rejection or betrayal. *See e.g., Id.,* p.69 (discussing Reggie D. Yager, *What's Missing From Sexual Assault*

---

[3] *Hearing Audio* at 01:34:22 (emphasis added).

2

*Prevention and Response*, (April 22, 2015) http: ssrn.com/abstract=2697788). Another possible explanation is that ▮▮▮ needed someone to blame because she regretted her actions, despite engaging in them freely at the time. This is supported by the fact that she told Inspector Shaaban that she "does not really do that kind of thing" and that the "next day she stated that she felt bad about herself," as well as her statement that she realized after sending the text "that I really didn't have a good time" – suggesting that as she contemplated the events of the night before, she began to regret her behavior. *Exhibit 1*, p.133; *Hearing Audio* at 50:46.

Unfortunately, the Hearing Panel ignored the evidence of my innocence in my pre-hearing written statement even though it was consistent with my statements at the hearing and to Investigator Shaaban. Making matters worse, the Hearing Panel incorrectly alleged my testimony was less credible than ▮▮▮ testimony. This allegation lacked merit in part because the Hearing Panel knew ▮▮▮ credibility was largely invalidated by facts such as items 1-6 above. *Compare, Id.,* p.144 (containing the Hearing Panel's "credibility" allegations), with *Hearing Panel Audio* (detailing Hearing Panel's knowledge of items 1-6).

Why would the Hearing Panel intentionally ruin my life so they could embrace ▮▮▮ false allegations? The facts detailed below identify the cause as being internal and external pressure for the College to equate complainants in sexual misconduct proceedings as females who must receive preferential treatment over males like me. *See generally, Infra,* §(B)(1)(discussing same). As a result, the Hearing Panel's decision must be reversed for at least the following two reasons identified in your June 7, 2016 letter:

> (1) the College's investigation did not comply with this Policy and this failure resulted in a decision adverse to [me], (2) . . . the sanctions and/or other remedies are substantially disproportionate to the misconduct . . . ." *Exhibit 1,* p.146 (containing Asso, Dean Anderson's June 7, 2016 letter to Respondent) (quoting *SMP §XIV(E)*).

Consequently, based on the information in §§B-D below, I respectfully request the Coordinator and the Appeals Officer exercise their authority under the SMP to reject the Hearing Panel's unlawful decision and expunge my record at the College of any and all references to this disciplinary procedure.

**(B)** **The College's failure to comply with the SMP motivated their unlawful discipline.**

Sadly, the College violated my SMP and Title IX rights throughout the course of its investigation. For example, our correspondence identifies over a dozen examples of the College's violations of the SMP and/or Title IX. *See generally, Exhibit 1,* pgs.1-9 (containing Respondent's March 13, 2016 letter to Asso. Dean Anderson); *Id.,* pgs.19-22 (containing Respondent's March 16, 2016 letter to Asso. Dean Anderson); *Id.,* pgs.32-42 (containing Respondent's April 8, 2016 letter to Asso. Dean Anderson); *Id.,* pgs. 57-62 (containing Respondent's April 22, 2016 letter to Asso. Dean Anderson); *Id.,* pgs. 72-73 (containing Respondent's April 29, 2016 letter to Asso. Dean Anderson); *Id.,* pgs. 85-86 (containing Respondent's May 8, 2016 letter to Asso. Dean

Anderson); *Id.,* pgs. 91-92 (containing Respondent's May 10, 2016 letter to Asso. Dean Anderson) (collectively referred to as "Pre-Hearing Communications").[4]

After my parents hired an attorney and I was able to begin defending myself from these false allegations, you reluctantly remedied some of the violations I brought to your attention. *Id.* But, at least two unresolved SMP and/or Title IX violations were never addressed. First, College employees including yourself, President Kwang-Wu Kim, and Asso. Vice President Sharon Wilson-Taylor refused to discipline College students who retaliated against me for exercising my SMP and Title IX rights in defending against ▬▬ false allegations. *See generally, Exhibit 1,* pgs. 1, 22, 26-27, 40, 53, 57, 67 (discussing same).

Second, the College refused to remedy conflicts of interest and/or gender bias issues related to Investigator Sarah Shaaban, yourself, and/or the Hearing Panel members which prohibited the College's ability to honor the SMP's mandate that I receive an "adequate, reliable, and impartial investigation . . . ." *See e.g., Exhibit 1,* pgs.33-35 (discussing same). For example, I expressed deep concern that Investigator Shaaban and the adjudicators in my case might be involved "in either: (1) the events being currently investigated by OCR in response to a Title IX complaint filed against the College; and/or (2) the College's response to the OCR investigation." *Id.,* p.34.

Nevertheless, you refused to provide me any information related to this OCR investigation even though I detailed how Investigator Shaaban repeatedly violated my SMP rights. *Id.,* pgs.33-34. As a result, I requested the "College . . . appoint a new mutually agreeable investigator – from outside the college - who will restart the process in accordance with the SMP and Title IX." *Id.,* p.34.

You rejected my request even though it turned out my concerns about Investigator Shaaban's bias were correct. For instance, Investigator Shaaban attempted to artificially inflate ▬▬ alcohol intake after I raised concerns that ▬▬ incapacitation claims were false. This occurred in Investigator Shaaban's May 5, 2016 Summary which states ▬▬ reported that she "had *at least* 3-4 beers" on the evening she claims I assaulted her. *Exhibit 1,* p.134 (emphasis added). Investigator Shaaban knew this claim was false because ▬▬ initially reported having 3-4 beers and subsequently sent Investigator Shaaban an email stating she consumed only "3 beers." *Id.,* p.133. On no occasion did ▬▬ report having *more* than 3-4 beers.

Similarly, when I learned that ▬▬ was dishonestly alleging incapacitation, I asked Investigator Shaaban to interview three students who saw ▬▬ on the night in question because they would likely testify that she was not incapacitated. *Id.,* p.68-69. Investigator Shaaban interviewed these students. *Id.* pgs.36-38. After these interviews, two of the three students, as

---

[4] It should be noted, the College considers rules and regulations issued by the Department of Education's ("DOE") Office of Civil Rights ("OCR") to be part of the College's SMP. *See e.g., SMP §1* (stating the College is "committed to . . . implementing regulations ("Title IX") prohibit[ing] discrimination on the basis of sex in education programs or activities."); *Id., p.28* (containing Asso. Dean Anderson's April 4, 2016 letter to Respondent stating: "[t]he College designed its Policy to comply with rules and regulations issued by the Department of Education's Office of Civil Rights ("OCR")).

well as a third student who was not interviewed, signed affidavits stating ▇ did not appear intoxicated or incapacitated. *Exhibit 3,* pgs.1, 3-4. But, Investigator Shaaban's witness summery of their testimony was devoid of this testimony which would have undermined ▇ credibility. *Exhibit 1,* p.136-138. Consequently, the Hearing Panel's finding should be reversed in part because Investigator Shaaban's conduct irreparably prejudiced me by violating the SMP's mandate that I receive an "adequate, reliable, and impartial investigation. . . ." *See e.g., Exhibit 1,* pgs.2-3 (discussing same).

**(B)(1)** <u>**The Hearing Panel's decision should be reversed because it was motivated by anti-male gender bias.**</u>

The Hearing Panel's decision should also be reversed because our Pre-Hearing Communications document how the College equates complainants in sexual misconduct proceedings as being females who must receive preferential treatment. For instance, I noted:

> "[T]he SMP explicitly encourages the College's participation in anti-male "public awareness events such as, 'Take Back The Night,' the Clothesline Project, candlelight vigils, protests, or survivor speak-out events." *Id., § XII*. The SMP states the College uses these anti-male 'public awareness' events to 'provide information about students' Title IX rights at these events.' *Id., § XII. Id.* In addition, the SMP suggests a presumption of my guilt in part by referencing ▇ as the 'victim', whom the College must not subject to 'additional trauma.' Examples of this language include referring to Complainants like ▇ as:
>
> - '<u>*Victims*</u> who may not be ready to report formally, but would still like information and support . . . .' *Id.*, §IX(A)(2)(emphasis added).
>
> - 'The College understands that <u>*victims*</u> of Sexual Misconduct may experience difficulty recalling some details of an incident and that certain memories may become repressed. Accordingly, individuals should report as much information as they can initially but know that they may add to or otherwise modify a complaint at any time.' *Id., XIV(B)(2)(emphasis added)*.
>
> - The Panel shall endeavor to conduct the Hearing in a manner that does not inflict <u>*additional trauma*</u> on the Complainant. *Id., §XIVD)(3)(emphasis added)*.
>
> Moreover, the SMP provides no 'interim measures' to falsely accused male students even though ▇ false allegations destroyed my life and subjected me to acts of violence and public ridicule. Instead, the SMP's interim Measures below are designed to help Complainants like ▇ and hurt Respondents like me:
>
> - ' . . . . the Coordinator . . . shall . . <u>*protect the Complainant*</u> . . . [by imposing] temporary remedial actions may include, but are not limited to:
>
>   - Offering on-campus <u>*counseling to the Complainant*</u> at the College's cost;

5

**Complaint Exhibit A, page 5**

- *Providing the Complainant with appropriate academic adjustments* with the consultation of appropriate faculty members (such as changes in course schedules, tutoring, or the provision of alternative course completion options);

- Offering *extracurricular accommodations to the Complainant*;

- *Changing the Complainant's living and dining* arrangements;

- *Assisting with the Complainant's transportation* to and from classes (to the extent practicable on Columbia's campus);

- *Working with the Complainant to modify work schedules* and other conditions;

- *Temporarily suspending the Respondent* if the College determines that the Respondent poses a significant and immediate threat to an individual or that the Respondent's continued presence on campus is likely to create substantial disruptions;

- *Modify the Respondent's academic, extracurricular, living, or other arrangements, while the investigation is pending*.' *Id., §XIV(A)(7)*(emphasis added).

In fact, the SMP mandates the College 'take such interim steps in a manner that *minimizes the burden to the Complainant*. . . .' *Id., §XIV(A)(7)*. Given the direct and/or circumstantial evidence of the College's inappropriate gender bias and/or burden shifting detailed above and below, I respectfully request the charge against me be adjudicated via a mutually agreeable process outside the College." *Exhibit 1,* p.4-5.

Despite this evidence, you rejected my request to adjudicate the charge against me via a "mutually agreeable process outside the College." Similarly, you dismissed my concerns of being sacrificed as one the Colleges' male scapegoats to OCR in response to OCR's investigation of the College. *See e.g., Id.,* pgs. 4-7, 33-35, 41, 58-59 (discussing OCR's investigation of the College; gender bias at the College; and the College's violation of Title IX). You brushed off these concerns even though ▓▓▓▓▓ complaint was linked to this OCR investigation in an April 11, 2016 article in the Columbia Chronicle. *See Exhibit 4* (containing said article).

Unfortunately, our Pre-Hearing Communications only scratch the surface of evidence suggesting OCR wants schools like the College to eliminate the rights of male students like myself. But, rest assured, I am not requesting the College wage a battle with OCR on my behalf. Rather, as detailed below, I ask that the Hearing Panel's erroneous finding against me be reversed because it was either: (a) motivated by the unlawful gender bias addressed in our Pre-Hearing Communications; of (b) violated SMP and/or OCR's mandates for an "impartial" adjudication of sexual misconduct allegations.

6

**Complaint Exhibit A, page 6**

**(B)(2)** **The Hearing Panel violated the SMP and Title IX's mandate for an "impartial" adjudication of the charges against me.**

The finding against me must be reversed because the Hearing Panel violated the "impartial" mandates contain in the SMP and OCR's directives. *Exhibit 1,* p.2 (discussing SMP and OCR's requirement that sexual misconduct charges be adjudicated in an "impartial" fashion). In my case, the lack of impartiality appears to have been caused in part by gender bias in the training provided to the Hearing Panel. For, as you likely recall, you repeated blocked my attempts to expose this bias by prohibiting my access of the College's sexual misconduct training materials. *Id.,* pgs. 6, 34-35, 59, (discussing Asso. Dean Anderson's rejection of Respondent's request for access to the sexual misconduct training materials). As a result, a reasonable juror would likely find the reason you refused to provide these training materials was because they evidenced gender bias against male students like me.[5]

But even if the Hearing Panel alleges their conduct was untailed by gender bias, the erroneous finding against me must still reversed because the audiotape of the hearing proves the Hearing Panel manifest at least six examples of profound bias in favor or ▓▓▓. First, a reasonable juror would reject the Hearing Panel's allegation that ▓▓▓ testimony was "more credible" than my testimony. *Exhibit 1,* p.144 (containing the Hearing Panel's decision). This is because the ▓▓▓ testimony cannot be "more credible" than my testimony, since:

1. The hearing panel members ("Hearing Panel") determined ▓▓▓ falsely alleged I "physically held" her "down and prevent[ed] her from leaving [my] room"; *Exhibit 1,* p.140 (containing the Hearing Panel's findings);

2. The Hearing Panel agreed ▓▓▓ allegations that I forced her to engage in "non-consensual kissing" were untruthful; *Id.*;

3. Despite ▓▓▓ allegations to the contrary,[6] a polygraph expert determined: (1) I did *not* force ▓▓▓ to perform oral sex on me; (2) ▓▓▓ did *not* push my head away

---

[5] I used the "reasonable juror" standard in my appeal in part because our Pre-Hearing Communications contained my concerns that if: "I am later found responsible - I will have no alternative but to file a lawsuit to: (a) clear my name, (b) remedy the Title IX concerns discussed above; (c) address violations of my contractual and/or quasi-contract rights under the College's policies; and/or (d) seek damages from those that defamed me and/or engaged in the aforementioned hostility and retaliation."

[6] *See, Exhibit 1,* p.133 (containing College Investigator Sarah Shaaban's ("Investigator Shaaban") report which states ▓▓▓ alleged – on one hand – that her voluntary consumption of alcohol caused her fade "in and out of consciousness" and caused her to experience "long [periods of] time where she doesn't remember" what happened. But on the other hand, ▓▓▓ alleged remembering that: "Respondent 'pushed her down' and made her give him oral sex. She then stated he gave her oral sex and that she was trying to push him away . . . [s]he stated [when he was forcing her to perform oral sex] she kept trying to push him away and he pushed he head back down on his penis . . . [s]he also mentioned she had bruises on both shoulders . . . [s]he believed the bruises . . . were from him holding her down.").

7

**Complaint Exhibit A, page 7**

when I performed oral sex on her; and (3) ▓▓▓ did *not* appear to me to be under the influence of alcohol or drugs. *Exhibit 2* (containing Polygraph report presented to Hearing Panel);

4. Dr. Gary Lage - a toxicologist expert - proved ▓▓▓ falsely claimed she was so incapacitated that she was fading in and out of consciousness. *Compare, Exhibit 1,* p.100-104 (containing report of toxicologist expert Dr. Gary Lage) with *Id.,* p.133 (containing ▓▓▓ statements about fading in and out of consciousness.");

5. Three students provided sworn affidavits stating ▓▓▓ did not manifest signs of incapacitation when they observed her shortly before she claims alcohol caused her to fade in and out of consciousness. *See generally, Exhibit 3* (containing said affidavits which were presented to Hearing Panel); and

6. ▓▓▓ repeatedly provided contradictory testimony which included, but was not limited to:

    a. On one hand, telling the Hearing Panel that she felt her "responses [to me] were unclear or very passive . . . <u>I never completely said the word no</u> . . ."[7] – while on the other hand – telling Investigator Shaaban that she made "repeated requests for the sexual interaction to stop." *Exhibit 1,* p.83 (containing May 6, 2016 Charge Letter from Asso. Dean Anderson to Respondent); and

    b. Admitting that the morning after she claims I assaulted her with enough force to leave bruises on shoulders, she sent me a text message stating she had "good time" with me the night before. *Exhibit 1,* p.133 (containing ▓▓▓ statements regarding same). When I raised this point in the hearing, ▓▓▓ explanation was that "I realized like after I sent it that I really didn't have a good time with him, and I wasn't really thinking when I sent that text." *Hearing Audio* at 50:46. However, ▓▓▓ also stated that she "asked her friends what she should say" when responding to the text message. *Exhibit 1*, p.133; see also *Hearing Audio* at 48:44 (containing a similar statement). The statement that she "wasn't really thinking" is inconsistent with the idea that she had discussed her response with her friends. More importantly, if I had truly assaulted ▓▓▓ with such force that she had bruises, it seems unlikely that she would have to think about whether she had had a good time.

The above evidence demonstrating my credibility contrasts with the four weak arguments that the Hearing Panel gave in support of their decision that ▓▓▓ was more credible. First, the Hearing Panel alleged my: " Intake Form seemed to convey a genuine account of events that took place the evening in question . . . [and my] subsequent statements conflict with some of those made in the intake form and appear to be artificial." *Exhibit 1*, p.144. But, the Hearing Panel does not provide any examples of these conflicts, other than a slight discrepancy regarding the order in which we got undressed. Nor does the Hearing Panel explain how the Intake form was "genuine"

---

[7] Hearing Audio at 01:34:22 (emphasis added).

while the subsequent responses were "artificial." On the contrary, I believe that my subsequent statements were more thorough and complete because, as noted elsewhere, during the initial interview with Investigator Shaaban, I did not even know what I was being accused of.

Second the Hearing Panel alleged I: "stated that [████] consented to each allegation. However, the Panel determined that [████] showed considerable hesitancy to engage physically with the Respondent. For example, in the text messages that were submitted as evidence, [████] demonstrated little interest in [my] advances." *Id.* In making this comment, the Hearing Panel erroneously conflates [████] lack of interest following December 11, 2015, with her interest on that night. By [████] own statements, it is hard to see how she "showed considerable hesitancy". On the contrary, she acknowledged that she was "equally as enthusiastic" in making out with me on the couch and agreed to go back to my room with me. *Hearing Audio* at 51:53, 48:44. This is also supported by:

1. Witness #3, who reported that he saw [████] and I on the couch "kissing each other;"

2. Witness #4 who reported that he saw that [████] "had her head resting on [my] chest;" *Exhibit 1*, p.138; and

3. Simon [████] affidavit, in which he stated that when he saw us in the living room of my apartment, [████] "seemed to want to enter [████] bedroom; she seemed disinterested in talking to me or anyone else in the living room. Prior to them entering [████] bedroom, they kissed and she seemed completely content with it." *Exhibit 3*, p. 4.

Given the above, the Hearing Panel's conclusion that "the Complainant showed considerable hesitancy to engage physically with the Respondent" is not supported by the preponderance of the evidence.

Third, the Hearing Panel incorrectly alleges I "submitted a confusing picture of [████] alcohol consumption . . . [because my evidence] appears to suggest simultaneously that the Complainant suffered from alcohol-induced amnesia (from the Toxicology report) and had very little to drink at all (per witness statements)." *Exhibit 1*, p.144. First of all, it is unclear how any confusion regarding my evidence on [████] alcohol consumption makes her allegations of alcohol induced incapacitation more credible. Furthermore, the Hearing Panel misconstrues the evidence presented regarding [████] alcohol consumption. The toxicology report, witness statements and [████] own statements all support the view that while [████] may have had enough to drink to have suffered from alcohol-induced amnesia, she did not drink enough to be incapacitated or to have "blacked out" or have been "in and out of consciousness." *Hearing Audio* at 07:25; *Exhibit 1*, p. 103, 132-133, 137-138; *Exhibit 3*, p.1, 3 and 4. A reasonable juror would find this evidence decreased [████] credibility since it shows that either: (a) she is not being truthful about having lost consciousness; or (b) her memories from the night in question are impaired.

Finally, the Hearing Panel erroneously argues: the "polygraph questions submitted failed to shed light on the alleged violations of the College policy. For example: One of the questions asked was "On or about December 11, 2015, did you use any force to cause [████] to perform

9

oral sex on you?" The Panel notes that while force certainly could indicate non-consensual sex, there are many other variables that could indicate non-consensual sex as it is defined in the College's policy. Moreover, the Panel did not receive a copy of the pre-test interview cited in the report." *Exhibit 1*, p. 145.

While the Hearing Panel is correct that variables other than force could indicate non-consensual sex, the polygraph question focused on the use of force because this is the specific policy violation alleged by ▓▓▓. Moreover, "force" is dispositive with regard to ▓▓▓ credibility because she alleged use of enough "force" to leave bruises on her shoulders. Therefore, the polygraph questions the Hearing Panel attacked are highly relevant to both ▓▓▓ and my credibility with respect to this alleged violation of the SMP. As a final note, it is my understanding a copy of the pre-test interview cannot be provided as it was an oral interview which was not recorded.

Based on the evidence above, a reasonable juror would find the Hearing Panel violated OCR's guidance regarding credibility and corroborating evidence. *See generally, OCR's Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* ("OCR's Sexual Harassment Guide") (January 2001).[8] For, OCR's Sexual Harassment Guide recommends evaluating the "relative credibility" of evidence by <u>looking at the level of detail and consistency</u> of each person's account . . . in an attempt to determine who is telling the truth. Another way to assess credibility is to see if <u>corroborative evidence is lacking where it should logically exist</u>." *OCR's Sexual Harassment Guide,* p.9.) (emphasis added). *See also,* OCR's 2014 *Questions and Answers On Title IX and Sexual Violence*, p.40 (mandating schools like Columbia train Adjudicators about "how to determine credibility; how to evaluate evidence and weigh it in an impartial manner." ).[9] Here – as this appeal details – an impartial Hearing Panel would have had determined the "level of detail and consistency" in our respective statements and "corroborative evidence" establish my innocence. The Hearing Audio demonstrates that with respect to each and every question that I was asked, I responded with greater detail than ▓▓▓ and the consistency of my numerous oral and written statements can be contrasted with the blatant contradictions in ▓▓▓ testimony detailed herein.

The second reason a reasonable juror would find the Hearing Panel manifest a profound bias in favor of ▓▓▓ is because they unlawfully prohibited me from exposing ▓▓▓ lack of credibility. For instance, during the hearing, I provided the Hearing Panel with *Exhibit 5* which contained my proposed questions for ▓▓▓ But, the Hearing Panel refused to ask ▓▓▓ *any* of the questions from *Exhibit 5* and instead, when I requested during the hearing that they ask the questions, one of the members blatantly lied, stating "I think we have asked many of them, actually." *Hearing Audio,* 01:18:50. In reality, the Hearing Audio proves the Hearing Panel asked *none* of my questions of ▓▓▓ which I repeat verbatim below:

1. After you were interviewed by Investigator Shaaban, do you remember sending her email an email stating you only had "3 beers" on December 11th?

---

[8] (available at https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf).

[9] (available at http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf).

- This information located on bottom of page 2, of Complainant's Summary, in Addendum section.

2. You sent Investigator Shaaban his email because you – "wanted to me more precise" about how much alcohol you drank– correct?
   - This information located on bottom of page 2, of Complainant's Summary, in Addendum section.

3. Do you agree, you claim there are "long time[s]" that you don't "remember" what happened on December 11th because you were "under the influence of alcohol"
   - This quotation is located on page 2, of Complainant's Summary.

4. You allege your consumption of alcohol caused you to fade "in and out of consciousness" - right?
   - This quotation is located on page 2, of Complainant's Summary.

5. Have you ever heard people say they cannot remember embarrassing things they did the night before because they drank too much?

6. Wouldn't you say - that in the days after December 11th, you "felt bad about" your actions in ▮▮▮ bedroom on December 11th?
   - page 2 of Complainant's Summary states: "[t]he next day she stated she felt bad about herself."

7. Wouldn't you also agree - you were concerned about some of complements or suggestive things you said to ▮▮▮ in his bedroom on December 11th?
   - page 2 of Complainant's Summary states ▮▮▮ "[s]he remembered he was complementing her during the night and he would want her to say something about him."

8. You asked ▮▮▮ if he had a condom - because you thought ▮▮▮ was interested in having sex and you were not on birth control– right?
   - page 2 of Complainant's Summary

9. Let's change topics just a bit. I would like you to review Malhaar ▮▮▮ notarized affidavit and when you are done please let us know.

   Beyond any objection you might have to this affidavit, what information in the hearing panel's documents can you point to that contradicts Malhaar's affidavit about December 11th?

10. Can you please review Simon ▮▮▮ affidavit and when you are done please let us know.

11

**Complaint Exhibit A, page 11**

Beyond anything you might personally disagree with, what information in the hearing panel's documents can you point to that contradicts Simon's affidavit?

11. Next, I would like you to review Lorenzo ▇ affidavit and when you are done please let us know.

   Beyond any objection you might have to the contents of Lorenzo's affidavit, what information in the hearing panel's documents can you point to that contradicts Lorenzo's affidavit?

12. Finally can you please review Zach ▇ affidavit and when you are done please let us know.

   Beyond any concern you might personally have with this affidavit, what information in the hearing panel's documents can you point to that contradicts Zach's affidavit?

13. Let's shift gears for a few minutes - do you recall telling Ms. Shaaban that during a party on December 11th you "tried to push [▇] away a couple of times" when he was trying to kiss you?
    - This quotation is located on page 1 of Complainant's Summary.

14. Did you review Investigator Shaaban's summary of Witnesses 1, 3 and 4 who reported seeing you and ▇ interact at the party on December 11th?
    - This information is located in Investigator Shaaban's May 5th Witness summary.

15. Can you point to anything in Investigator Shaaban's summary of Witnesses 1, 3 or 4 that suggests they saw you trying to push ▇ away from you at the party?

16. Can you point to something in the hearing panel's documents – other than your own testimony – that supports your allegation that you were trying to push ▇ away from you at the party?

17. Despite pushing ▇ "away a couple of times," you decided to leave the party with ▇ to go to his room - right?
    - This information located bottom of page 1 of Complainant's Summary – going on to page 2.

18. Why would you agree to go the bedroom of someone who you so repulsed you that you were pushing them off you just minutes before?

19. Do you remember sending ▇ a text message on December 12th acknowledging you had a great time with him on December?

12

**Complaint Exhibit A, page 12**

      Present text message if necessary.

20. You told ▮ that you had a good time because you "wanted to be nice" to him – right?
    - This information located bottom of page 2 of Complainant's Summary – going on to page 2.

21. Before you sent this text on December 12th, you talked to some friends about how to respond to ▮ – do you remember that?
    - This information located bottom of page 2 of Complainant's Summary – going on to page 2.

22. During your conversations with these friends on December 12th, did you discuss the alleged non-consensual physical interactions you are making against ▮ in this case?

23. During your conversations with friends on December 12th, did you tell them about the bruises you allege ▮ gave you on December 12th?

24. Do you have any photos of these bruises to present to the hearing panel?

25. Can you point to any information in the hearing panel's documentation that contains the testimony of someone who saw these alleged bruises?"

How would a reasonable juror react to the Hearing Panel's refusal to ask these questions of ▮ They would likely find the Hearing Panel violated the SMP and Title IX's "impartial" mandates by: (a) refusing to ask ▮ relevant and reasonable questions because they knew ▮ answers to these questions would undermine her credibility; and (b) falsely claiming the Hearing Panel asked ▮ the aforementioned questions. *Compare, Exhibit 5* (containing Respondent's questions for ▮ with *Hearing Audio* (proving the Hearing Panel did not ask the questions in Exhibit 5).

      The third reason a reasonable juror would likely find the Hearing Panel manifest an unlawful bias in favor of ▮ is because the Hearing Panel relentlessly cross-examined me while asking ▮ no questions that might have exposed her false statements against me. Evidence of this biased behavior is repeated over and over again in the hearing audio. For example, the Hearing Panel asked ▮ questions such as: "what consent" she gave me when she alleged she was "being physically held down uhm and being prevented from leaving the room?" *Hearing Audio,* 1:04:05. How did ▮ respond to this softball question designed to increase her credibility? She started to bunt and then stopped her response mid-sentence by stating: "Uhm, there was no consent, like I just, I was, I felt uncomfortable the whole time and thought that he." *Id.* On another occasion, the Hearing Panel preempted a question to ▮ about what consent she had given to kissing me on the couch with the comment "You said that you did not give consent", despite the fact that just a few minutes earlier, ▮ had said explicitly that she "was okay" with the kissing. *Hearing Audio* at 48:44, 51:53. In addition, the Hearing Panel members failed to question inflammatory statements made by ▮ during the hearing, including her statement that "I genuinely have

13

**Complaint Exhibit A, page 13**

been fearful for my life from this." *Id*. at 01:38:20. Had the Hearing Panel questioned ▓ about such fears, or had I been given the opportunity to question her, they would have learned that this statement had no foundation because I have not interacted with ▓ in any way since December 2015. I sent her a few text messages prior to winter break, and when she failed to engage in conversation, I dropped all contact.

In contrast to their treatment of ▓ Hearing Panel members repeatedly threw me hostile knuckle ball questions in the hopes of impeaching my credibility. For example, one question falsely alleged I had earlier testified to "grabb[ing]" ▓ hand and trying to get her to "touch" my penis against her will when she the "pulled her hand back." *Id.,* 1:11:02. In response, I explained the Hearing Panel member's question misrepresented my earlier testimony be stating:

> "Well I had asked first if she would have liked to [touch my penis], and she said yeah, and when she pulled back, she pulled back and after that I did not request that anymore. Oh but at some point later in the night when we were making out, she voluntarily by herself put her hand on my penis . . . ." *Id.*

It should be noted, during my testimony, I repeatedly identified the reason I orally asked ▓ for her permission to engage in things like touching my penis. Specifically, I stated this was because the video the College asked me to watch suggested I should verbally ask for permission prior to sexual contact. *See e.g., Id.,* at 00:07:02; and 00:17:42. My testimony about asking for permission is consistent with my written statement which stated: "▓ initiated or verbally consented to all physical interactions with me on December 11, 2016." *Exhibit 1,* p.69.

Therefore, the Hearing Panel's attempts to spin my statements as inconsistent lack merit. This is particularly true because unlike ▓ allegations which were repeatedly discredited, the worst that can be said about my testimony is that it became more detailed as the College provided me more information. If you put yourself in my shoes, you should have no problem understanding how this occurred. For, nobody disputes the fact that when I gave my first statement to Investigator Shaaban I did so without anybody at the College telling me "exactly what allegations ha[d] been made against me." *Id.,* p.2. Consequently, as the College slowly dribbled these facts to me, a reasonable juror would find it perfectly natural that my response would address these ever expanding allegations.

Fourth, a reasonable juror would likely find the Hearing Panel manifest a profound bias in favor of ▓ because they ignored ▓ hearing testimony which undermined her credibility. For example, the table below details ▓ lack of credibility with regard to our kissing and time spent on a couch:

| Conflicting testimony in ▓ allegations about kissing and our | ▓ told Investigator Shaaban that she tried "to push" me "away a couple of times" when we were kissing on a couch at a party prior to going to my room. *Exhibit 1,* p.132. |
|---|---|
| | At the hearing, ▓ told a different story stating: |

| interactions on the couch. | "I just wanted to clarify uhm, about, so the kissing at, on the couch was, and going to his apartment, I did say okay to those things, I was okay with those things." *Hearing Audio*, 48:44.<br><br>"So, I did give consent when we kissed and when we went to his room." *Id.*, 1:26<br><br>"I, when we began to kiss, I was also, I didn't hesitate at first and I did try to pull away at times but I did, uh overall uh I was okay with it and I was, uh I guess you could say was equally as enthusiastic as he was." *Id.*, 51:53 |
|---|---|

Fifth, a reasonable juror would likely find the Hearing Panel manifest a profound bias in favor of ▬▬▬ because they violated SMP §XIV(D)(6) which states:

"[t]he Hearing Panel *shall examine all evidence* received through the course of the investigation *and hearing* and, as required by the Office for Civil Rights, determine whether it is more likely than not that the Respondent engaged in the misconduct alleged (a "preponderance of the evidence" standard." (emphasis added).

A reasonable juror would find the Hearing Panel violated this mandate in part because the table below highlights much of the evidence they ignored with regard to ▬▬▬ allegation that she was incapacitated:

| Why The Evidence Disproves ▬▬▬ Incapacitation Allegations | Testimony/Evidence |
|---|---|
| Testimony regarding ▬▬▬ alcohol intake | ▬▬▬ email to Investigator Shaaban states she only consumed 3 beers. *Exhibit 1,* p.133 |
| | Witness #2 told Investigator Shaaban that ▬▬▬ had about 3-4 beers. *Id.,* p.137 |
| | Witness #4 told Investigator Shaaban that he saw ▬▬▬ with a can of beer in her hand but he did not know how many she had consumed. *Id.,* p.138. |
| | Lorenzo ▬▬▬ affidavit stated: "[h]ad Ms. Shaaban asked me if [▬▬▬] seemed intoxicated or incapacitated when I saw her on December 11th, I would have responded by stating she did not appear so. This is because when I saw [▬▬▬] on December 11th she did not exhibit any problems with her equilibrium or speech. In addition, I did not see her vomit, lose consciousness, or exhibit similar symptoms I associate with being intoxicated or incapacitated." *Exhibit 3,* p.3 |

| Why The Evidence Disproves ▓▓▓ Incapacitation Allegations | Testimony/Evidence |
|---|---|
| | Malhaar ▓▓▓ affidavit stated: "Ms. Shaaban never asked me if [▓▓▓] seemed intoxicated or incapacitated. Had Ms. Shaaban asked me this question, I would have told her when I saw [▓▓▓] at a Bob's Burgers night on December 11, 2015 she did not appear in any way incapacitated." *Id.,* p.1. |
| | Simon ▓▓▓ affidavit stated: ▓▓▓ "did not seem intoxicated or incapacitated. Rather, she looked to be in full control of herself, did not have any problem walking and seemed to want to enter ▓▓▓ bedroom; she seemed disinterested in talking with me . . . they kissed and she seemed completely content with it." *Id.,* p.4. |
| Why ▓▓▓ incapacitation claims lack merit | ▓▓▓ alleges her alcohol consumption caused her to experience a "long [period of] time where she doesn't remember" what took place and she alleges fading "in and out of consciousness" because of her alcohol consumption. *Exhibit 1,* p.133. |
| | A toxicologist expert noted that:<br><br>"Based on the worst case scenario" ▓▓▓ "blood alcohol level three hours after her consumption, the assumed time of the sexual activity, would have been approximately 0.095%, which is sufficient to render her intoxicated, but neither stuperous nor unconscious, and she certainly would have been aware of her actions." *Id.,* p.102<br><br>"large amounts of alcohol, particularly if consumed rapidly, can produce partial (i.e. fragmentary) or complete (i.e., en bloc) blackouts, which are periods of memory loss for events that transpired while a person was drinking." "individuals can engage in a wide range of goal-directed, voluntary, often complicated behaviors during blackouts – from driving cars to having sexual intercourse." "Alcohol-induced blackouts are very common among college age individuals."<br><br>"The fact that Ms. ▓▓▓ has limited memory of the events on the night of December 11, 2015, is totally consistent with her stated alcohol consumption, and alcohol-induced amnesia." *Id.,* 102-03. |

Simply put, the aforementioned table does not support ▓▓▓ claim that she was so intoxicated that she "lost consciousness." However, it is possible and even likely that she experienced alcohol-induced amnesia and does not remember everything that happened. This is supported by the fact

16

**Complaint Exhibit A, page 16**

that ▇▇▇ testimony provided significantly fewer details regarding the events of the night than my testimony. Regardless, these facts prove the Hearing Panel ignored major defects with ▇▇▇ credibility.

Sixth, a reasonable juror would likely find the Hearing Panel manifest an unlawful bias in favor of ▇▇▇ because it violated guidelines set forth by Association of Title IX Administrators ("ATIXA"). ATIXA is a group that has published papers advocating that colleges severely limit the procedural protections afforded male students in sexual misconduct cases. Nevertheless, in the Tip of the Week – attached as *Exhibit 6* - ATIXA discussed how five universities "got it completely wrong" in finding male students responsible for "hook-ups" when alcohol was involved. Specifically, ATIXA expressed concerns that these universities are making "Title IX Plaintiffs" of the students who were wrongly accused (and) noted:

> "*A common policy problem comes from failing to distinguish between intoxicated and incapacitated*. Yet, the most serious issue comes from failing to implement a mens rea, if you will, within the definition. Certainly, criminal concepts like mens rea are not strictly applicable to the campus conduct process, but if we agree as I stated above that having sex with a willing, yet intoxicated person is not an offense, *there must be something that the respondent does, beyond having sex, that makes a lawful act (sex) into a policy violation . . . there has to be something more than an intent to have sex to make this an offense. Otherwise, men are simply being punished for having sex, which is gender discrimination under Title IX, because their partners are having sex too and are not being subject to the code of conduct for doing so*. Without a knowledge standard, a respondent will suffer an arbitrary and capricious application of the college's rules." *Exhibit 6*, (*emphasis added*).

To avoid this error, ATIXA directs universities to determine if: "*[t]he respondent knew that the Complainant was drinking or using drugs and may know how much/what kind.*" Here, my oral testimony and polygraph prove ▇▇▇ never appeared incapacitated to me. Next, ATIXA suggests groups like the Hearing Panel determine if ▇▇▇ "*was stumbling or otherwise exhibited loss of equilibrium*" or exhibiting "*[s]lurred speech or word confusion*" . . . "*[b]loodshot, glassy or unfocused eyes*" . . . "*[a]ny of the signs of alcohol poisoning*" . . . "*[v]omiting, especially repeatedly*" . . . *being disoriented, or confused as to time, place, etc.*, or . . . "*[l]oss of consciousness.*" Here, the record is completely devoid of any eye-witness testimony suggesting ▇▇▇ displayed any of these symptoms.

Given the multiple violations of the SMP and Title IX described above, I request the College's Coordinator and the Appeals Officer exercise their authority under the SMP to reject the Hearing Panel's unlawful decision and expunge my record at the College of any and all references to this disciplinary procedure.

Such a finding is particularly warranted because the College and the Hearing Panel's handling of my case evidences the erroneous conduct roundly criticized in the three attached court decisions in *Exhibits 7-9*. These recent decisions address lawsuits filed by male students who were falsely accused of sexual assault. The two California decisions reversed university discipline in part because universities:

    a. Allowed adjudicators to render findings of responsibility based on impermissible factors;

    b. Unduly hindered the accused's ability to cross-examine female students who alleged sexual assault; and /or

    c. Provided the accused with insufficient access to information about charging and/or factual allegations against them. *See generally, Exhibit 7-8* (containing *Doe v. University of Southern California, Cali.* Court of Appeals, 2nd App. Dist., No. BS148077 (April 5, 2016); and *Doe v. Regents of Univ. of Cal. San Diego,* Sup. Court of Cal., Cty. Of San Diego, No.37-2015-10549 (July 10, 2015)).

    Similarly, the College's handling of my case runs afoul of concerns addressed in *Doe v. Brandeis Univ.,* U.S. Dist. Ct. Dist. Of Mass., No. 15-11557. *See, Exhibit 9* (containing same). The *Brandeis* Court rejected a motion to dismiss various breach of contract, equitable, and negligence claims. *Id.,* p.11-12. This occurred in part because the falsely accused male student was subjected to a disciplinary procedure that denied him the right to confront witnesses. *Id.* p.10. In addressing these defects, the *Brandeis* Court noted:

> "Brandeis's authority to discipline its students is not entirely without limits. Although the relationship between the university and its students is essentially contractual, the university's disciplinary actions may also be reviewed by the courts to determine whether it provided 'basic fairness' to the student. While that concept is not well-defined, and no doubt varies with the magnitude of the interests at stake, it is nonetheless clear that the university must provide its students with some minimum level of fair play." *Id.,* p.10-11.

The *Brandeis* decision also illuminated how OCR pressure likely prompted the Hearing Panel to severely discipline male students like myself even though the preponderance of the evidence clearly proves I am innocent. For instance, the *Brandeis* Court noted:

> "In recent years, universities across the United States have adopted procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response . . . [t]he goal of reducing sexual assault . . . is certainly laudable. Whether the elimination of basic procedural protections—and the substantially increased risk that innocent students will be punished—is a fair price to achieve that goal *is another question altogether*." *Id,* p.11 (emphasis added).

I request the College's Coordinator and the Appeals Officer answer this question by finding the Hearing Panel committed reversible procedural errors by finding me responsible when the clear preponderance of the evidence proved I am innocent.

18

**Complaint Exhibit A, page 18**

**(C)** **The sanction imposed violates the SMP.**

As detailed above, the totality of the evidence points to only one reliable conclusion - I should be found not responsible because ▮▮▮▮ allegations against me are false. At the very least, the facts above warrant a reduction of the sanction imposed to something akin to the "verbal reprimand" referenced in SMP §XIV(D)(7) which the College would agree to expunge from my record after a short period of time. This is because SMP §XIV(D)(7) suggests harsh sanctions such as a "suspension" imposed against me is only appropriate in situations such as:

1. Situations where the responded engaged in "Sexual Misconduct in the past";

2. Facts that suggest "the conduct at issue here was premeditated"; or

3. "The probability that [I] will offend again . . . ."

None of these aggravating factors exist here. Therefore, I request that the sanction against me be determined a violation of the SMP.

**(D)** **Conclusion**

In conclusion, I want to emphasis the incredible damage I have suffered because ▮▮▮▮ and the Hearing Panel decided to falsely label me a sexual predator. The stigma of this label has left me deeply depressed and fearful because my lifetime dreams are now all but impossible if my academic record is marred with the false allegation that I sexually assaulted someone. For since being falsely accused, I learned that male students are being denied entry even to at community colleges and the military because their Colleges found them responsible for sexual misconduct. Therefore, I beg the Coordinator and the Appeals to reject the Hearing Panel's unlawful decision and expunge my record at the College of any and all references to this disciplinary procedure so that I can begin to put this nightmare behind me.