**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JOHN DOE,                  )
                               )
          Plaintiff,      )     Case No. 17-CV-00748
                               )
          v.               )     Hon. Amy J. St. Eve
                               )
COLUMBIA COLLEGE CHICAGO, et.    )
al.,                        )
                               )
          Defendants.    )

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

On January 30, 2017, Plaintiff John Doe ("Doe") brought the present Complaint against Defendants Jane Roe and Columbia College Chicago ("CCC"), collectively "Defendants," alleging violations of the 20 U.S.C. § 1681, Title IX ("Title IX"), defamation, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. Before the Court is CCC's motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants CCC's motion without prejudice and grants Plaintiff leave to file an Amended Complaint consistent with this opinion.

## BACKGROUND

This case arises from an alleged sexual assault that occurred at CCC and the discipline that resulted from that alleged assault. Plaintiff and Defendant Roe were both students at CCC in 2015, and after they had a sexual interaction on December 11, 2015, Roe accused Plaintiff of sexually assaulting her when she was incapacitated by alcohol. (R. 1, Compl. ¶¶ 4, 22-23.) CCC

then suspended Plaintiff for the 2016-17 academic year—a decision Plaintiff claims was wrongful. (*Id.* ¶ 23.)

## I.      Roe's Initial Complaint and Doe's Response

Doe alleges that all physical contact between himself and Roe on December 11, 2015 was consensual and that Roe requested that Doe engage in sexual intercourse with her—a request he declined. (*Id.* ¶ 5.) Doe claims that he presented CCC with the following pieces of evidence that demonstrated he had not sexually assaulted Roe when she was incapacitated by alcohol:

- A toxicologist expert determined that Roe falsely alleged her self-induced alcohol consumption caused her to fade "in and out of consciousness" when interacting with Doe;

- Affidavits from three CCC students indicated that Roe did not manifest signs of incapacitation the night of incident;

- CCC's panel ("Hearing Panel") concluded that Roe falsely alleged that Doe held her down and forced her to engage in non-consensual kissing;

- A polygraph expert confirmed that Doe honestly testified that he did not force Roe to perform oral sex on him, Roe did not push his head away when he performed oral sex on her, and Roe did not appear to Doe to be under the influence of alcohol or drugs;

- Roe sent Doe a text message the morning after the incident saying she had a "great time" with Doe;

- Roe admitted to the Hearing Panel that her responses to Doe were "unclear or very passive" despite previously claiming that she made repeated requests for the sexual interaction to stop.

(*Id.* ¶ 6.) Doe alleges that Roe acted with malice by falsely telling CCC that he assaulted her because she was angry that Doe declined Roe's request to have sexual intercourse. (*Id.* ¶ 7.)

## II.     Roe's Non-Privileged Defamation

Doe alleges that in February 2016, Roe began making false statements to third parties accusing Doe of sexually assaulting her. (*Id.* ¶ 8.) Roe made statements, for example, to individuals who anonymously gave Doe a note on or about February 3, 2016, which threatened

Doe and called him a "fucker" for sexually assaulting Roe. (*Id.* ¶ 9.) Also in February 2016,

Roe made a social media post in which she stated: "I have 46 followers her [sic] on Twitter and

nothing to lose . . . why the hell would I lie about being raped? . . . [t]he point is Columbia needs

to get their shit together because I'm leaving this school & this city if they don't do something

now . . . [because] they are just letting a predator get away and it makes me sick." (*Id.* ¶ 10.)

Although that post did not mention Doe, several of her Twitter followers responded with

statements such as "[Doe] is a rapist and should not have the privilege of attending school at

Columbia," and "boy like [Doe] are the reason #INeedFeminism." (*Id.* ¶ 11.) Roe also made

statements to friends, which led female CCC students to make the following social media posts,

among others:

- "I do not feel safe knowing I live in the same building as a rapist. [D]o something about [Doe]."

- "[Doe] FROM . . . AT PLYMOUTH RAPED SOMEONE. PASS IT ON."

- "[Doe] is a rapist and endangering all of Columbia's students, & he is still allowed to live here. Columbia is so disappointing.

(*Id.* ¶ 12.) Doe alleges Roe's statements caused a female friend of hers to punch Doe and caused

other friends to give him the middle finger. (*Id.* ¶¶ 13, 15.)

## III.    Doe's Complaints to CCC About Roe's Retaliatory Conduct

On March 13, 2016, Doe informed CCC that he was suffering retaliation, physical

assault, and widespread defamation at the hands of Roe and her friends, after he engaged in

"protected activity" by participating in CCC's investigation. (*Id.* ¶ 28.) CCC's Student Sexual

Misconduct Policy & Procedures ("SMP") states in § VI that it "is a violation of this Policy and

Title IX to retaliate in any way against an individual who has  . . . assisted in the Grievance

Procedures. Columbia will promptly investigate any allegation of retaliation and pursue

3

disciplinary action as needed." (*Id.* ¶ 29.) Despite this policy and Doe's complaints, after Doe complained, CCC sent Doe a letter stating that it was not aware of Roe's friends' physically assaulting Doe. (*Id.* ¶ 30.) On April 8, 2016, Doe sent CCC a social media post from a female student that stated: "@coolandcozy one of my best friends punched [Doe] in the face. [I]t was immediately reported to the police and the dean. Isn't that cute." (*Id.* ¶ 31.) On April 8, 2016, CCC Associate Dean Wilson-Taylor responded to Doe in a letter stating that CCC was not able to initially identify the student, but that CCC had addressed the issue with the female student and asking Doe to inform him if the student interacted with him at all. (*Id.* ¶ 32.) Doe alleges on information and belief that CCC did not discipline the female student in the same way it disciplines male students involved in similar conduct. (*Id.* ¶ 33.)

On March 13, 2016, Doe informed CCC that Roe's retaliation was forcing him to withdraw from CCC. (*Id.* ¶ 34.) He stated that it was impossible for him to focus on school after being falsely accused of sexual assault and then being physically attacked. (*Id.*) Doe sent another email to CCC on March 29, 2016 informing CCC that two of Roe's friends gave him the middle finger. (*Id.* ¶ 35.) Doe alleges that CCC's communications with Doe did not respond to his allegations, and as a consequence, he sent a letter to CCC on April 8, 2016, stating that he believed CCC's failure to respond to Roe's retaliation created a hostile and abusive environment for himself and other male students. (*Id.* ¶ 36.) On or about April 22, 2016, Doe informed CCC that a CCC student texted Doe's then girlfriend, who is now his wife, and told her he was a "rapist" who was "lucky he has his teeth." (*Id.* ¶ 40.) On April 25, 2016, CCC sent Doe a letter informing him that CCC had spoken to the student and told him not to have any contact with Doe or his wife. (*Id.* ¶ 41.) Despite this letter, Doe alleges that CCC refused to accommodate Doe's wife when she wanted to be in a different class than Roe after Roe threated to fight her on social

media. (*Id.*) Doe alleges that these interactions are evidence of CCC's repeated refusal to discipline students who were engaging in retaliation in violation of Title IX. (*Id.* ¶¶ 42-43.) Doe also alleges upon information and belief that CCC never disciplined Roe for violating CCC's no-contact order or for disclosing confidential information related to CCC's disciplinary process. (*Id.* ¶ 45.)

## IV.    CCC's Disciplinary Proceeding

Doe claims that he repeatedly put CCC on notice that its disciplinary proceeding violated its own policies and Title IX. (*Id.* ¶ 45.) In a March 13 letter, for example, Doe informed CCC of the following violations, among others:

- SMP § XIV(C)(1) – "the Coordinator . . . shall serve . . . the Respondent with written notification than an Actionable claim has been filed, a description of the type of Sexual Misconduct alleged . . ., and the investigator's name."

- SMP § XIV(C)(2) – "the Coordinator shall meet . . . the Respondent to apprise [him] of [his] rights under this Policy and to . . . provide . . . notice of the types of information that likely will be disclosed during the investigation. . ."

- SMP § 1 XII – CCC "shall complete an adequate, reliable, and impartial investigation."

(*Id.*) CCC responded by informing Doe that its policies were designed to comply with the rules and regulations issued by the Department of Education's Office of Civil Rights ("OCR"), including providing due process to the alleged perpetrator and employing procedures designed to lead to supportable decisions. (*Id.* ¶¶ 46-47.)

Doe claims CCC violated Title IX and its own policies because it completed its "investigation" of the incident and scheduled a disciplinary hearing before Doe had access to Roe's complaint and allegations and then informed Doe of Roe's accusations in person not by mail or email as CCC's policy requires. (*Id.* ¶ 48.) At the time of Doe's meeting with CCC officials, CCC had only provided Doe with an email asking him to meet, an email prohibiting

him from entering certain CCC buildings, and an email stating that he may have violated CCC's sexual misconduct policy. (*Id.* ¶ 49.) Doe claims that he was thus denied the opportunity raise a conflict of interest issue with regard to the CCC investigator or to submit evidence and witnesses, and that he was not updated on the status of the investigation. (*Id.* ¶ 50.)

Eventually, on April 22, 2016, after requesting to submit evidence, Doe submitted a written statement to CCC on April 25, 2016. (*Id.* ¶ 53.) In the statement, Doe provided the names of multiple witnesses he and Roe interacted with the night of the incident and claimed that their physical interactions were completely consensual. (*Id.*) Doe also claimed that he had suffered retaliation and that he would be willing to withdraw from CCC and not reapply if CCC would allow him to withdraw in good standing. (*Id.*) Doe claims that he wrote this statement because CCC refused to identify the policies he was accused of violating, refused to include facts he submitted in its investigation, and refused to provide him with information about the evidence Roe provided. (*Id.* ¶¶ 54-57.) CCC did not provide Doe with access to the investigatory file until May 12, 2016, and Doe still did not receive CCC's investigator's interview notes. (*Id.* ¶¶ 58-59.) Doe alleges that the investigative file did not contain information about Roe's receipt of medical treatment, and he claims CCC removed this exculpatory information from the file. (*Id.* ¶ 60.)

Doe and his advisor attended the CCC hearing, as well as CCC's attorney, Hearing Panel Members Chindlun, Wordlow, and Baldford, and Roe and her advisor, who attended by Skype. (*Id.* ¶ 62.) The Hearing Panel found by a preponderance of the evidence that Roe falsely alleged that Doe physically held her down and that he forced her to engage in non-consensual kissing. (*Id.* ¶ 63.) Nevertheless, the Hearing Panel found Doe responsible for sexually assaulting Roe after determining her testimony was more credible than Doe's. (*Id.*) As a result, on June 7,

2016, CCC suspended Doe for the 2016-17 academic year and barred him from ever living in a CCC residence hall.  (*Id.* ¶ 64.)

On June 23, 2016, Doe appealed the Hearing Panel's decision.  (*Id.* ¶ 65.)  In his appeal, Doe claimed that he did not assault Roe and that CCC conducted an inadequate and biased investigation.  (*Id.*)  Doe argued in the appeal that Roe made contradictory statements, that a toxicology expert proved she was not unconscious the night of the incident, he passed a polygraph test showing he did not assault Roe, and three students provided affidavits stating that Roe was not incapacitated the night of the incident.  (*Id.*)  Doe's appeal claimed that CCC's investigation did not comply with the SMP and resulted in an unlawful and biased decision that CCC should have reversed.  (*Id.*)  Doe's appeal also claimed that the Hearing Panel's decision was motivated by "anti-male gender bias" and that the investigation demonstrated that CCC gives preferential treatment to female alleged victims at the expense of falsely accused male students.  (*Id.*)  In his appeal, Doe also claimed that the Hearing Panel did not provide an "impartial adjudication" in part because the Hearing Panel members received gender biased training.  (*Id.*)  Regardless of their training, Doe claimed that the Panel conducted a biased inquiry in which they unfairly questioned only his credibility while not asking critical questions of Roe or questioning her contradictory and inconsistent testimony.  (*Id.*)

On July 11, CCC acknowledge receipt of Doe's timely appeal and sent it to Roe to allow her to provide a written response.  (*Id.* ¶ 66.)  Roe responded on July 8, and on July 13, CCC assigned Joe Steiff as the Appeals Officer for Doe's appeal.  (*Id.* ¶¶ 67-68.)  On July 15, Doe sent CCC a letter challenging Steiff for having a conflict of interest because he created an educational documentary entitled "How Will I Tell? Surviving Sexual Assault" that told the story of a victim of sexual assault.  (*Id.* ¶ 69.)  In response, CCC replaced Steiff with Elizabeth

Davis-Berg an Associate Professor of Science and Mathematics. (*Id.* ¶¶ 18, 70.) Davis-Berg rejected Doe's appeal on August 22, 2016. (*Id.* ¶ 71.)

Doe claims that the Hearing Panel's gender bias violated his rights under Title IX and CCC's policies. (*Id.* ¶¶ 72-73.) Doe alleges, for instance, that CCC refused to provide him with information about any accommodations CCC offered Roe in response to her complaint, and he argues that she may have accused him of sexual assault to receive certain accommodations. (*Id.* ¶¶ 74-76.) CCC told him that FERPA privacy concerns prohibited it from disclosing any accommodations it gave Roe. (*Id.* ¶¶ 76-77.) At the same time, CCC refused to grant Doe any accommodations despite Doe requesting accommodations to avoid confrontations with Roe and her friends.

## V. CCC's Alleged Anti-Male Bias

Doe alleges that SMP § XII "explicitly encourages" participation in "anti-male public awareness" events such as "Take Back the Night," the Clothesline Project, candlelight vigils, protests, and survivor speak-out events. (*Id.* ¶ 79.) Doe claims that these events demonstrate an intent to afford preferential treatment to females instead of implementing a gender neutral approach to alleged sexual misconduct. (*Id.* ¶ 81.) The Clothesline Project, for example, has the goal of "break[ing] the silence and bear[ing] witness to one issue – violence against women." (*Id.* ¶ 82.) Further, Doe alleges that CCC's SMP defines Roe as a "victim" who CCC must avoid subjecting to "additional trauma," which demonstrates an anti-male bias. (*Id.* ¶ 83.) Doe also alleges that CCC's SMP consistently requires that CCC "protect the complainant," "minimize the burden to the complainant," and "accommodate the complainant," without any concern for the interests of the accused. (*Id.* ¶ 84.) Doe alleges that CCC continually refused Doe's document and information requests that would have allowed him to expose gender bias at CCC.

8

(*Id.* ¶ 85.)  CCC also refused Doe's requests to review CCC's training materials, which would have allowed him to investigate his gender bias claims.  (*Id.* ¶¶ 87-88.)  Doe alleges that CCC's bias arose in part from OCR complaints CCC female students filed, which caused OCR to investigate CCC and caused CCC officials to have an anti-male bias.  (*Id.* ¶¶ 89-92.)

Furthermore, Doe alleges that the anti-male bias at CCC, and at other colleges, began in 2011 when OCR sent a "Dear Colleague" letter instructing colleges on how to comply with Title IX when investigating and resolving complaints of sexual misconduct.  (*Id.* ¶ 93.)  According to Doe, this letter uses language that caused colleges to equate females with being victims in sexual misconduct cases and to give them preferential treatment.  (*Id.*)  The letter identifies only women as victims and instructs colleges not to treat victims as if they are at fault.  (*Id.*)  Doe claims that the letter also makes it difficult for males accused of sexual assault to defend themselves by adopting the lowest burden of proof—more likely than not—in sexual assault cases.  (*Id.* ¶ 94.)  A later communication from OCR in 2014 similarly makes it difficult for an accused male to defend himself by instructing schools that the complainant need not be present at disciplinary hearings and recommending that schools avoid "revictimization" and consider eliminating cross-examination of victims.  (*Id.* ¶ 95.)  Neither the letter nor the 2014 communication were subject to notice-and-comment rulemaking, and some federal legislators, as well as private lawsuits, have challenged the communications' validity.  (*Id.* ¶¶ 96-97.)

Despite the OCR communications' allegedly questionable legitimacy, Doe alleges that CCC has treated the Dear Colleague letter as law and revised its policies in line with the letter. (*Id.* ¶ 98.)  These policy changes and OCR's investigation of CCC, occurred at the same time CCC was investigating Roe's claims.  (*Id.* ¶ 99.)  Doe alleges that OCR pressured CCC to treat women as victims and to give them preferential treatment in sexual misconduct cases.  (*Id.* ¶

100.)  Doe claims that CCC felt compelled to update its policies for fear that OCR would investigate and withdraw federal funds if it found CCC to not be in compliance with its interpretation of Title IX.  (*Id.* ¶¶ 102-04.)  As a result, Doe alleges that OCR essentially pressured CCC to severely discipline male students and alter its burden of proof standard to make it easier to find accused males responsible in sexual misconduct cases.  (*Id.* ¶ 105-06.)  As a result, Doe alleges that CCC ignored the exculpatory evidence establishing his innocence in fear of losing federal funds and in response to threats from the Obama Administration to punish institutions that did not adequately respond to sexual violence against women.  (*Id.* ¶¶ 111-117.)

Doe asserts that CCC also adopted policies that were gender-biased against males to avoid negative publicity that CCC did not adequately handle sexual assault investigations.  (*Id.* ¶ 109.)  Doe contends that CCC uses "archaic assumptions" that females are always the victims in sexual misconduct cases and that males cannot be the victims, and he argues that CCC exhibited these assumptions and biases in his case.  (*Id.* ¶ 110.)  In addition, Doe alleges that CCC created a hostile environment for male students, which included showing a film titled "The Hunting Ground," which detailed the stories of undergraduate sexual assault victims.  (*Id.* ¶¶ 121-22.)  Doe claims that "The Hunting Ground" has been criticized by many academics and news outlets for its anti-male bias.  (*Id.* ¶ 122.)  CCC also hosted events and programs, such as a "Consent Rocks" concert and a sexual assault webinar, that Doe alleges further the anti-male bias at CCC.  (*Id.* ¶¶ 123-25.)

As a result of these allegations, Doe brings several counts against Roe, CCC, and various CCC officials.  Against Roe alone, Doe alleges defamation.  (*Id.* ¶¶ 132-47.)  Against CCC alone, Doe alleges violations of Title IX on the basis of CCC's hostile environment, harassment, deliberate indifference, erroneous outcome, selective enforcement, and retaliation.  (*Id.* ¶¶ 148-

96.)  Doe also seeks a declaratory judgment against CCC for denying Doe the benefits of his

education and damaging his academic career.  (*Id.* ¶¶ 197-201.)  Doe also alleges promissory

estoppel and negligence claims against CCC.  (*Id.* ¶¶ 202-08.)  Finally, Doe alleges intentional

and negligent infliction of emotional distress against Roe and CCC.  (*Id.* ¶¶ 209-22.)

## LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the

viability of a complaint by arguing that it fails to state a claim upon which relief may be

granted."  *Camasta v. Jos. A. Bank Clothiers, Inc.,* 761 F.3d 732, 736 (7th Cir. 2014).  Under

Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the

pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The short and plain statement under Rule

8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it

rests."  *Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2007) (citation omitted).  Under the federal

notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to

relief above the speculative level."  *Twombly,* 550 U.S. at 555.  Put differently, a "complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).

In determining the sufficiency of a complaint under the plausibility standard, courts must

"accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor."

*Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).  When ruling on motions to

dismiss, courts may also consider documents attached to the pleadings without converting the

motion to dismiss into a motion summary judgment, as long as the documents are referred to in

the complaint and central to the plaintiff's claims.  *See Adams v. City of Indianapolis*, 742 F.3d

720, 729 (7th Cir. 2014); Fed. R. Civ. P. 10(c).  Because Plaintiff attaches photocopies of

documents involved in CCC's investigation that are central to his claim, the Court may consider these attachments in ruling on the present motion.

## ANALYSIS

### I.    Counts III-VI—Title IX Discrimination Claims

In Counts III-VI, Doe alleges Title IX discrimination claims.  Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The Supreme Court has found an implied private right of action in Title IX, with private parties authorized to seek monetary damages for intentional violations.  *See Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 173 (2005) (*citing Cannon v. Univ. of Chi.*, 441 U.S. 677, 690–93 (1979)).  To sufficiently plead Title IX sex discrimination, a plaintiff must allege: 1) "that he was excluded from participation in or denied benefits of or subjected to discrimination in an educational program; 2) that receives federal financial assistance; and 3) that the exclusion was on basis of sex, i.e., gender."  *Ludlow v. Nw. Univ.*, 125 F. Supp. 3d 783, 791–92 (N.D. Ill. 2015) (citation and quotation omitted).  Title IX does not, however, create a private right of action for disparate impact cases.  *Id.* at 793 (citation omitted).  Thus, to survive a motion to dismiss, Doe "must provide some allegations to allow the Court to infer a causal connection between his treatment and gender bias and raise the possibility of relief under Title IX above the speculative level."  *Id.* at 792 (citing *Blank v. Knox Coll.,* No. 14–cv–1386, 2015 WL 328602, at *3 (C.D. Ill. Jan. 26, 2015) (dismissing flawed investigation Title IX claim).

Here, Doe alleges Title IX discrimination claims based on various theories—hostile environment harassment, deliberate indifference, erroneous outcome, and selective enforcement.

12

All of these Title IX discrimination theories, however, require allegations of gender-based conduct. As an initial matter, CCC argues that all of these claims fail because Doe has failed to allege that CCC engaged in any gender-based conduct with respect to these claims. Because determining whether Doe has alleged gender-based conduct as to each theory requires a specific inquiry into the allegations underlying each theory and the relevant requirements for each theory, the Court addresses each theory and CCC's arguments for dismissal separately below.[1]

### A. Count III-IV—Hostile Environment Sexual Harassment and Deliberate Indifference

Doe first alleges that CCC created a hostile environment for Doe by unfairly disciplining him in his sexual assault investigation because he was a male and failing to adequately respond to his harassment complaints because he was a male. While Doe plead these claims as two different counts, the Court will analyze them together because, as discussed below, both claims require proof of similar elements.

To establish a Title IX claim on the basis of sexual harassment that created a hostile environment, "a plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.

---

[1] One of Doe's theories supporting gender bias is that CCC was under pressure to find males at fault for sexual assault due to OCR investigations into CCC's policies. In his Complaint, Doe referenced those OCR investigations and attached letters relating to those investigations to his Complaint. (*See* Compl. Ex. M.) In its Reply Brief, CCC attached an updated letter from OCR and a letter from OCR to another college. Because CCC did not attach these documents to its Motion to Dismiss, Doe argues that the Court should convert CCC's motion into a motion for summary judgment and allow Doe to engage in discovery. (R. 43, Pl.'s Surreply.) Despite Doe's arguments, the Court will not convert CCC's motion into one for summary judgment. The Court will not consider CCC's additional attachments or the specific arguments it makes with respect to the attachments, but CCC's general arguments regarding bias in OCR investigations are permissible as they are closely related to CCC's arguments in its motion to dismiss.

*Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007). Similarly, under Title IX, educational institutions may be held liable for "deliberate indifference to known acts of harassment," of one student by another. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). For a school to be held liable for such harassment, it must be "deliberately indifferent to sexual harassment, of which [it] had actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650. The peer harassment forming the basis for a Title IX claim must also, of course, be "gender-oriented." *Id.* at 651.

Applying these standards, courts regularly reject Title IX claims where the complained of harassment was not gender-based. In *Nungesser v. Columbia University*, 169 F. Supp. 3d 353, 364–67 (S.D.N.Y. 2016), for example, a female student accused the male plaintiff of sexual assault. After the university found the plaintiff "not responsible" for "non-consensual sexual intercourse," the female student allegedly told other students to file complaints against him, notified a student group that he was a rapist, accused him of rape in media publications ultimately leading to his name being published, and undertook the "Mattress Project" to draw attention to her assault. *Id.* 359-61. The Plaintiff filed suit and the court dismissed his Title IX claims because he had failed to show any discrimination he suffered was "on the basis" of his gender. *Id.* at 364. The court explained that just because the underlying conduct was "sexual in nature" did not mean that the plaintiff's treatment implicated gender discrimination as required by Title IX. *Id.* at 365. The court found that calling someone a rapist, however hurtful, was not "inherently gendered." *Id.* Further, the court reasoned that the plaintiff had alleged that the female student's comments about him were motivated by her anger at his rejection of her, which demonstrated that any harassment he suffered was the result of their personal relationship not

because of his status as a male. *Id.* at 365-66. The female student's activism and public statements were all in response to a specific act and were directed at a specific individual, not all males, and thus there was no actionable claim for Title IX sexual harassment. *Id.* at 366-67.

Similarly, in *Doe v. University of Chicago*, No. 16 C 08298, 2017 WL 4163960, at *7 (N.D. Ill. Sept. 20, 2017), the court rejected the plaintiff's Title IX deliberate indifferent claim because the plaintiff failed to show that his harassment, which included his alleged victims' public accusations of rape and his placement on a list of rapists in the university community, was "plausibly sex-based." The court explained that "a false accusation of sexual assault is not, without more, harassment based on sex, notwithstanding the sexual content of the accusation." *Id.* (citations omitted). In this context, the court reasoned that the plaintiff's alleged victims' public comments were not aimed at him because of his gender, instead they harassed him "because they believed he had committed sexual assault or because of personal—not gender— animus." *Id.* at *8. Thus, the court concluded that because the plaintiff had "not alleged facts plausibly suggesting that [his alleged victims'] harassment was based on sex, he [had] failed to state a viable deliberate indifference claim." *Id.*; *see also Doe v. Univ. of Mass.-Amherst*, No. CV 14-30143-MGM, 2015 WL 4306521, at *8 (D. Mass. July 14, 2015), *appeal dismissed sub nom. Doe v. Univ. of Mass.-Amherst* (July 28, 2015) (dismissing a Title IX claim where the plaintiff cited only comments that targeted him as a student accused of sexual assault, not any comments "based on his gender" or "suggestive of gender bias").

Here, Doe claims that Roe and her friends engaged in gender-based harassment against him that created a hostile environment to which CCC was deliberately indifferent.[2] (R. 38, Pl.'s

---

[2] Doe also includes allegations relating to CCC's handling of Roe's sexual assault complaint and its discipline of Doe in his hostile environment and deliberate indifference claims. (Compl. ¶¶ 160-68.) These allegations, however, do not relate to harassment and are thus not relevant to the elements required to allege either of these claims, although they are discussed below in relation to Doe's selective

Resp. 12-13.)  Despite Doe's arguments, the reasoning in *University of Chicago* and *Nungesser* is applicable, and Doe's claim fails because he does not allege that the peer harassment at issue here was gender-oriented.  As in *University of Chicago*, any harassment that Doe suffered at the hands of Roe and her friends—including the alleged physical assault, the verbal comments made to Doe, and the social media comments and text messages—was "because they believed he had committed sexual assault or because of personal—not gender—animus."  WL 4163960, at *8. Doe's own allegations make clear that he was harassed because of his relationship with Roe and because of his status as a person accused of sexual assault, not because of his gender.  Roe and her followers' social media statements about Doe, for example, labeled him a "predator," a "rapist," and a "danger" to CCC's students.  (Compl. ¶¶ 10-12.)  Even viewed in the light most favorable to Plaintiff, these statements are not gender-based harassment because they derive solely from Doe's status as a person who Roe and her friends believed committed a sexual assault, not from Doe's status as a male.  As the court in *Nungesser* explained, calling someone a rapist is not "inherently gendered."  169 F. Supp. 3d at 365.  Additionally, as in *Nungesser*, Doe's allegation, (Compl. ¶ 53), that Roe may have accused him of sexual assault and harassed him because he refused to have sex with her or "rejected" her itself provides a gender-neutral and personal motivation for Roe's alleged harassment of Doe.  169 F. Supp. 3d at 365-66.

Similarly, Doe's allegations clearly suggest that Roe's friends' harassing actions— punching him in the face, giving him the middle finger, texting his girlfriend—were motivated by their belief that Doe sexually assaulted their friend.  Doe alleges, for example, that Roe made statements to a female friend "who punched Doe in the face because Roe told this student that

---

enforcement and erroneous outcome claims.  Doe effectively concedes this point in describing the elements of hostile environment and deliberate indifference claims in his Response and by focusing his arguments on Roe and her friends' alleged harassment of Doe.  (Pl.'s Resp. 12-13.)

Doe sexually assaulted Roe." (Compl. ¶ 13.) Doe also alleges that Roe made defamatory statements to her friends that caused them to give him the middle finger while they were with Roe. (Compl. ¶ 15.) Finally, Doe alleges that a CCC student texted his girlfriend that he was a "rapist" who was "lucky he has his teeth." (*Id.* ¶ 40.) All of these allegations suggest that Roe and her friends' alleged campaign of harassment targeted Doe and Doe alone, not because he is a male, but because Roe told her friends that Doe had sexually assaulted her and because they thus had personal animus towards Doe individually. Doe has thus not plausibly alleged that his harassment was gender-based. *Davis*, 526 U.S. at 651 (Title IX harassment must be "gender-oriented" to state a deliberate indifference claim); *Jennings*, 482 F.3d at 695 (harassment must be based on gender to state a hostile environment claim).

Accordingly, the Court dismisses Doe's hostile environment and deliberate indifference claims.

**B.      Count V—Erroneous Outcome Claim**

In Count V, Doe alleges that CCC reached an erroneous outcome in his disciplinary case as the result of its gender bias. CCC argues that this claim fails primarily because Doe has failed to allege that the outcome of Doe's disciplinary proceeding was erroneous or that it was the result of gender bias.

Erroneous outcome claims allege that "the plaintiff was innocent and wrongly found to have committed an offense." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). A plaintiff making an erroneous outcome claim must first "allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Id.* A plaintiff may allege, for example, "particular evidentiary weaknesses behind the finding of an offense such as a motive to lie . . . particularized strengths of the defense . . . [or] particular

procedural flaws affecting the proof." *Id.* Once the plaintiff has established doubt concerning the accuracy of the proceeding, he must next "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* (citations omitted). The *Yusuf* court noted that "[s]uch allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

Applying these rules, several courts have examined allegations similar to those here, and courts generally find that, even where the plaintiff has sufficiently alleged the first requirement and cast doubt on the accuracy of the finding, general allegations about public pressure to resolve sexual assault complaints are insufficient to show that gender bias was the motivating factor in the erroneous result. In *Doe v. University of Massachusetts-Amherst*, 2015 WL 4306521, at *8, for example, the plaintiff alleged that his finding of sexual misconduct was erroneous because he received affirmative consent from the alleged victim, there were no clues that she was too intoxicated to consent, he had difficulty getting information and documents, the hearing board misused witness testimony, and he was limited in his ability to cross-examine witnesses. *Id.* The court found these allegations sufficient to cast doubt on the accuracy of the finding, but nevertheless rejected the plaintiff's claim because the plaintiff had failed to provide sufficient allegations that this flawed outcome was because of the plaintiff's gender. *Id.* The court reasoned that the plaintiff had not cited any examples of comments by the board that targeted him because of his gender—as opposed to his status as a student accused of sexual assault—or any conduct indicative of gender bias. *Id.* The court explained that the university's investigation was plausibly "prompted by lawful independent goals, such as the desire (enhanced, perhaps, by

the fear of negative publicity or Title IX liability to the victims of sexual assault) to take

allegations of rape on campus seriously." *Id.* (citations and quotations omitted).

Similarly, in *Doe v. University of Cincinnati*, 173 F. Supp. 3d 586, 606 (S.D. Ohio 2016),

the court rejected the plaintiff's erroneous outcome claim finding the plaintiff had not alleged an

indication of gender bias and instead, "at worst, [the university's] actions were biased in favor of

alleged victims of sexual assault." The court explained that many of the actions the university

took in response to the sexual assault complaint—such as giving the alleged victim class

schedule accommodations or limiting the male student's access to certain buildings—were

legitimate interim measures that complied with Title IX guidance issued by the Department of

Education. *Id.* at 606-07. The court found that the plaintiff also failed to allege any facts

indicating that the university's procedural mechanisms, such as its cross-examination rules, were

the result of gender bias. *Id.* at 607. The plaintiff also cited to statistics purporting to show that

the university discriminated against males in imposing discipline for sexual misconduct, but the

court found these statistics unconvincing because the university primarily received complaints of

male-on-female sexual assault, so the statistics did not show that the university's procedures

discriminated against males. *Id.* at 608. The court further noted that since disparate impact

claims are not permitted under Title IX, the plaintiff's claim could not survive merely by alleging

that the university's other gender-neutral policies had a disproportionately harmful effect on

men. *Id.*

Several other courts have similarly rejected erroneous outcome claims based upon

allegations of general anti-male bias resulting from public and government pressure. *See, e.g.*,

*Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016) (rejecting plaintiff's claim that

university adopted male-biased sexual assault investigation procedures to appease federal

government); *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 474–75 (S.D.N.Y. 2015), (rejecting plaintiff's claim because he did not provide statements by university officials showing discriminatory intent or statistical evidence that "males invariably lose" when charged with sexual misconduct and thus did not "provide any evidence suggesting that the outcome was born out of gender bias"); *Doe v. Univ. of Colo.*, No. 16-CV-1789-WJM-KLM, 2017 WL 2311209, at *11 (D. Colo. May 26, 2017) ("pressure from the [] government to investigate sexual assault allegations more aggressively—either general pressure exerted by the Dear Colleague Letter or specific pressure exerted by an investigation directed at the University, or both—says nothing about the University's alleged desire to find men responsible because they are men.")

In contrast, where the plaintiff can identify specific facts or comments by university officials that are indicative of gender bias, courts will allow Title IX erroneous outcome claims to stand. In *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 189 (D.R.I. 2016), for example, the court denied the defendant-university's motion to dismiss the plaintiff's claim in part because the plaintiff alleged that university officials had made particular statements indicating a gender bias against males. Specifically, the plaintiff alleged that a university employee said male students were "guilty, until proven innocent" and that the university had "loaded the dice against the boys." *Id.* Additionally, professors had stated that there was "overwhelming" gender bias in sexual misconduct cases at the university and the plaintiff identified similar past cases where the university showed a bias in favor of females. *Id.* Similarly, in *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015), the court found that the plaintiff had sufficiently alleged gender bias where one of the officials administering the disciplinary proceeding had recently endorsed an article that argued that sexual assault occurred whenever "a woman has consensual sex with a man and regrets it because she had internal

reservations that she did not outwardly express." *See also Doe v. Univ. of Chi.*, No. 16 C 08298, 2017 WL 4163960, at *5 (N.D. Ill. Sept. 20, 2017) (allowing Title IX claim where plaintiff alleged that university official intentionally encouraged victim to file false complaint); *Prasad v. Cornell Univ.*, No. 5:15-CV-322, 2016 WL 3212079, at *17 (N.D.N.Y. Feb. 24, 2016) (allowing erroneous outcome claim where one investigator made a "drastic change" in their findings late in the investigation).

Here, Doe has alleged facts sufficient to cast some doubt on the accuracy of his disciplinary proceeding—for example, the toxicology report indicating Roe did not fade in and out of consciousness, the students' affidavits indicating Roe did not appear incapacitated, Roe's amicable text messages to Doe the next morning, and Doe's own testimony that Roe consented to their interaction. Doe's claim fails, however, because he has not sufficiently alleged particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding. *Yusuf*, 35 F.3d at 715. Unlike *Brown Univ.*, *Washington & Lee*, *Univ. of Chi.*, and *Prasad*, Doe does not allege any statements from university officials about gender bias at CCC, did not show that a key university official had recently endorsed an article biased towards female victims, and Doe does not allege that the Hearing Panel members encouraged the victim to file a false complaint or drastically changed their position during the disciplinary process.

Without evidence of a statement indicative of gender-bias from a CCC official, Doe instead attempts to create an inference of gender-bias with several allegations that purport to show that CCC favored Roe and was biased against Doe because of gender. Doe alleges, for example, that CCC policies and events, such as "Take Back the Night" and other public awareness events, are anti-male. These events, however, are not gender-biased and instead are legitimate preventative education programs and resources that OCR has explicitly instructed

universities to provide for survivors and victims of all genders. (Compl. Ex. A1 79) (noting that OCR issued guidance stating that "OCR wants students to feel free to participate in preventative education programs and access resources for survivors" and specifically mentioned "Take Back the Night"); *see also Univ. of Cincinnati*, 173 F. Supp. 3d at 602 ("It should be a laudable goal for a university to raise the awareness of its faculty and staff to sexual assault and to increase their sensitivity to the particular problems that victims of sexual violence experience. . .")

Doe also alleges that various aspects of CCC's disciplinary and investigatory process were unfair to him. Doe complains, for example, that CCC excluded evidence that Roe was not intoxicated, that the student manual refers to complainants as "victims" suggesting a presumption of guilt, that CCC questioned Doe more aggressively than Roe, and that Doe was not provided access to training materials and communications with OCR. None of these allegations, however, are indicative of gender bias against males. As an initial matter, there are legitimate truth-seeking reasons—aside from gender bias—for these procedural measures. CCC, for example, may provide those accused of sexual assault only with documents relevant to the incident at issue to ensure that the focus of the disciplinary hearing remains on the facts related to the incident. Similarly, CCC may have questioned Doe more aggressively because his version of the facts was not consistent or questioned the alleged victim more gently to ensure she was not intimidated into not speaking out. (*See* Compl. Ex. A1 141-42) (noting that Doe's written and oral statements during the investigation were inconsistent.)

More importantly, even viewing these allegations in the light most favorable to Plaintiff, they all are indicative, at best, of a bias in favor of sexual assault complainants and against those accused of sexual assault, regardless of gender. Doe has not alleged, for example, that CCC would have provided the requested documents to a female accused of sexual assault, or that CCC

would have questioned a female accused of sexual assault more leniently. *Univ. of Colorado*, WL 2311209, at *12 (rejecting Title IX claim because even if aspects of "truth-seeking process were unfair" to the plaintiff, he cannot allege that they were unfair to him because he was a male). Additionally, if anything, the use of the word "victim" in CCC's policy manual similarly creates a bias in favor of those who complain of sexual assault, not in favor of females specifically. Indeed, the manual does not use gendered pronouns and states that the policies apply "regardless of the identity of a victim, witness, or Complainant." (Compl. Ex. B § II.) *See King v. DePauw Univ.*, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014) ("is not responsible for the gender makeup of those who are accused *by other students* of sexual misconduct.")

Similarly, CCC's decision to provide interim measures to Roe and not to Doe demonstrates, if anything, a legitimate and reasonable bias in favor of alleged victims of sexual assault. As the court explained in *University of Cincinnati*, accommodating an alleged victim's class schedule to avoid confrontations with the person accused of sexual assault is a legitimate interim measure that complies with Title IX guidance issued by the Department of Education. 173 F. Supp. 3d at 606-07. Indeed, in the 2011 Dear Colleague letter that Doe cited in his Complaint, the Department of Education explicitly stated that "Title IX requires a school to take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation." (Compl. ¶ 47) (citing "Dear Colleague Letter," U.S. Dep't of Education Office of Civil Rights (Apr. 4, 2011) https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf .)

Finally, Doe argues that the Court should infer gender bias from the fact that OCR previously had investigated CCC regarding Title IX complaints, and subsequent publicity from that investigation pressured CCC to investigate and punish males more harshly. This argument

also fails. First, "it is not reasonable to infer that [a university] has a practice of railroading students accused of sexual misconduct simply to appease the Department of Education and preserve its federal funding." *University of Cincinatti*, 173 F.Supp.3d at 602; *see also Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 887 (N.D. Ohio 2017) (pressure for OCR to comply with Title IX does not "support a plausible inference of gender discrimination). Second, even assuming CCC reacted to the previous OCR investigation by responding to sexual assault allegations more aggressively, such acts would suggest a bias in favor of sexual assault victims, not against males. *Wooster*, 243 F. Supp. 3d at 886 (noting that past investigation and public criticism "may supply a possible motive for favoring assault victims" but "does not . . . suggest a basis for discrimination against male students."); *Univ. of Colo.*, WL 2311209, at *11 ("pressure from the [] government to investigate sexual assault allegations more aggressively—either general pressure exerted by the Dear Colleague Letter or specific pressure exerted by an investigation directed at the University, or both—says nothing about the University's alleged desire to find men responsible because they are men.")

In sum, many of Doe's allegations purporting to create an inference of a gender bias have a legitimate basis in complying with the Department of Education's instructions and ensuring that CCC protects victims of sexual assault. *Univ. of Cincinnati*, 173 F. Supp. 3d at 607 ("many of the actions taken by UC which Plaintiffs claim are indicative of gender bias complied with Title IX guidance issued by the Department of Education."); *Wooster*, 243 F. Supp. 3d at 887 ("evidence that a university has endeavored to comply with federal guidance on Title IX cannot support a violation of Title IX."). Further, even viewing the allegations in the light most favorable to Doe and assuming CCC's process was biased, if anything, CCC's bias was in favor of victims of sexual assault. *Univ. of Colo.*, WL 2311209, at *12 (finding that "inference of pro-

victim bias is an obvious alternative explanation . . . that overwhelms any potential inference of gender bias.")  Again, CCC is not "responsible for the gender makeup of those who are accused by other students of sexual misconduct."  *DePauw Univ.*, 2014 WL 4197507, at *10.

Accordingly, the Court dismisses Doe's Title IX erroneous outcome claim.

### C.    Count VI—Selective Enforcement Claim

In Count VI, Doe alleges that CCC violated Title IX by selectively enforcing its sexual assault policies on the basis of gender.  A selective enforcement claim under Title IX "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."  *Yusuf*, 35 F.3d 709 at 715; *see also Ludlow*, 125 F. Supp. 3d at 792.  "To support a claim of selective enforcement, a male plaintiff must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University."  *Xiaolu Peter Yu*, 97 F. Supp. 3d at 480 (citation omitted).  "The male plaintiff must show that the University's actions against the male plaintiff were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings."  *Id.*

Here, Doe's claim fails because he does not allege that CCC treated similarly-situated students of another gender more favorably than it treated him.  In his Complaint, Doe alleges that CCC treated Roe and her friends more favorably than him with regard to the discipline they faced after confrontations on campus and social media interactions.  Doe's selective enforcement claim, however, relates to the disciplinary proceeding against him for sexual assault, not the disciplinary proceedings related to the interactions that followed the alleged assault, and Doe fails to allege that a female who, like him, had been accused of sexual assault would not have been subjected to the exact same disciplinary proceedings.  Without these allegations, Doe's

selective enforcement claim fails. *See, e.g.*, *Ludlow*, 125 F. Supp. 3d at 793 (dismissing claim because plaintiff failed to allege "that a female [] would have been treated more favorably in the same circumstance); *Doe v. Univ. of Mass.-Amherst*, No. CV 14-30143-MGM, 2015 WL 4306521, at *9 (D. Mass. July 14, 2015), *appeal dismissed sub nom. Doe v. Univ. of Mass.* (July 28, 2015) (dismissing selective enforcement claim because plaintiff did not plead "pled facts from which a plausible inference of gender bias can be drawn" and or any facts "indicating male and female students accused of sexual harassment are treated differently by the university in terms of the way complaints are pursued or discipline is imposed"); *Xiaolu Peter Yu*, 97 F. Supp. at 480 (rejecting selective enforcement claim because plaintiff was unable to show that a similarly-situated female would have been subject to a more lenient sanction); *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 779 (S.D. Ohio 2015) (dismissing Title IX claim because plaintiff asserted "no facts to suggest that [the University] would have treated a female accused of sexual assault any differently in her investigation or that the University would have acted differently in a disciplinary procedure against a female accused of sexual assault.").

Doe attempts to salvage his selective enforcement claim by pointing to the following "upon information and belief" allegations in his Complaint:

- CCC possesses documents showing a pattern of gender-biased decisions providing preferential treatment to female students who falsely accused male students of sexual misconduct (Comp. ¶ 167);

- CCC possesses documents evidencing its refusal to discipline female students accused of sexually assaulting male students (*id.* ¶ 168);

- CCC disciplined Doe because of "archaic assumptions" and stereotypes about male and female students and the gender of students that commit sexual assault (*id.* ¶ 110, 129); and

- At CCC, in virtually all cases of sexual assault, the victim is a woman and the accused student is a male." (*Id.* ¶ 158.)

These allegations, however, fail to provide sufficient support for Doe's selective enforcement claim.

The first allegation, relating to CCC's preferential treatment of female students who accuse male students of sexual assault, does not involve female students who were in the same situation as Doe—accused of sexual assault—and is thus not relevant to his claim. *Curto v. Smith*, 248 F.Supp.2d 132, 146–47 (N.D.N.Y. 2003) (dismissing a Title IX selective enforcement claim where academically-expelled female sought to compare more favorable treatment of male who had been dismissed due to misconduct). For similar reasons, Doe's allegations about CCC's inadequate response to his complaints about Doe and her friends are not supportive of gender bias because they relate to CCC's allegedly unequal treatment of individuals accused of sexual assault and alleged victims of sexual and their friends, not unequal treatment of males and females.

Doe's allegations about CCC's archaic assumptions and stereotypes are conclusory and do not plausibly suggest that CCC would have treated a female situated similarly to Doe more favorably. Similarly, the fact that "virtually all" cases of sexual assault at CCC involve a female victim and male accused does not support the inference that CCC treats males different, it merely "negates the possibility of establishing that female students were treated more favorably than males in similar circumstances" at CCC and does not suggest gender discrimination. *Prasad*, WL 3212079, at *18 (rejecting selective enforcement claim were plaintiff alleged that sexual misconduct claims were disproportionately "lodged by females against males"); *Doe v. Regents of the Univ. of Cal.*, No. 215CV02478SVWJEM, 2016 WL 5515711, at *5 (C.D. Cal. July 25, 2016) (finding that higher rate of sexual assault complaints "filed by women against men" does not "indicate[] discriminatory treatment of males accused of sexual assault"); *Rolph v. Hobart &*

*William Smith Colleges*, No. 6:16-CV-06515 EAW, 2017 WL 4174933, at *12 (W.D.N.Y. Sept. 20, 2017) (rejecting selective enforcement claim because complaint conceded that "women rarely, if ever, are accused of sexual harassment by the Colleges . . . which suggests that a similarly-situated comparator may not exist.").

Doe's allegation that CCC possesses evidence that it has refused to discipline female students accused of sexually assaulting male students is boilerplate and conclusory. This lone allegation is not sufficient to support a plausible inference that similarly situated females were treated more favorably than Doe, especially in light of Doe's allegation that "virtually all" sexual assault complaints were lodged by females against males, which suggests that CCC has not had the opportunity to refuse to discipline female students accused of sexual assault. *See Yusuf*, 35 F.3d at 715 (explaining that "wholly conclusory allegations" cannot support a selective enforcement claim); *Prasad*, 2016 WL 3212079, at *18 (conclusory allegations of disparate impact are insufficient to support a selective enforcement claim).

In sum, here, viewing the allegations in the light most favorable to Doe, he has at best alleged that CCC is biased against those accused of sexual misconduct, not against males. *Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214, 1225–26 (D. Or. 2016) (""If anything, Plaintiffs have alleged that the University is biased against alleged perpetrators of sexual misconduct, but that does not implicate gender discrimination simply because those alleged perpetrators are typically male. As Defendants point out, survivors and perpetrators alike may be male or female."). Doe has not alleged, however, that CCC would have treated a female differently than him in the same circumstances.

Accordingly, the Court dismisses Doe's selective enforcement claim.

## II.    Count VII—Title IX Retaliation Claim

The framework for Title IX retaliation claims is the same as for Title VII. *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017). Under this framework, a plaintiff can prove her retaliation claim using either the direct method of proof or the indirect method of proof. *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012). Here, Doe only invokes the direct method of proving retaliation.[3]  (Compl. ¶¶ 191-96.) A plaintiff can state a direct retaliation claim by alleging that (1) he engaged in protected activity under Title IX, (2) the defendant took an adverse action against him, and (3) there is a but-for causal connection between the protected activity and the adverse action. *Burton*, 851 F.3d at 695.

Here, Doe alleges that he engaged in protected activity by defending himself in the sexual assault disciplinary proceeding and filing complaints about Roe's retaliation against him requesting that CCC discipline Roe and her friends. He further alleges that CCC imposed adverse actions in response to each protected action first by disciplining him unfairly for sexual misconduct and second, by refusing to discipline Roe or her friends.

As to the first claim of retaliation, in relation to Doe defending himself at his disciplinary hearing, this claim fails because Doe's own allegations establish that CCC disciplined him for a legitimate, non-retaliatory reason—that he was accused of and found responsible for sexual misconduct. Indeed, an entity may not be held liable for retaliation if it had a legitimate non-retaliatory reason for taking the action alleged to be retaliatory. *See, e.g.*, *Doe v. Univ. of Pac.*, 467 F. App'x 685, 689 (9th Cir. 2012) (finding that university had a non-retaliatory motive for taking action to separate male and female athletes after complaint); *Gordon v. Traverse City*

---

[3] Doe does not explicitly forgo the indirect method, but he does not contend that he was treated less favorably than similarly situated students who did not engage in statutorily protected activity, which is an essential element of a prima facie case. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 688 (7th Cir. 2010).

*Area Pub. Sch.*, 182 F. Supp. 3d 715, 725 (W.D. Mich. 2016), <u>aff'd</u>, 686 F. App'x 315 (6th Cir.

2017) (rejecting Title IX retaliation claim because school had legitimate, good faith reason for

suspending plaintiff); *Condiff v. Hart Cty. Sch. Dist.*, 770 F. Supp. 2d 876 (W.D. Ky. 2011)

(rejecting retaliation claim because school had legitimate, non-retaliatory reason for non-renewal

of teacher's contract).  Here, Doe's own allegations and the exhibits to his Complaint

demonstrate that CCC investigated Roe's complaint and determined that Doe was responsible for

sexual misconduct.  (*See* Compl. Ex. A1 141-42) (Hearing Panel finding that Roe was more

credible than Doe and that Doe's statements were inconsistent.) CCC thus had a legitimate, non-

retaliatory reason for disciplining him for sexual misconduct.

As to Doe's second allegation, that he engaged in protected activity by complaining about

Roe and her friends' harassment and that CCC imposed an adverse action by refusing to

discipline Roe and her friends, this claim also fails.  Setting aside the question of whether Doe's

complaints about his non-gender-based harassment were protected activity,[4] Doe's claim still

fails because he has failed to allege a causal connection between his protected activity and the

allegedly adverse action.  A Title IX claim fails if the plaintiff has not alleged some "retaliatory

motive" connecting the protected activity to the adverse action.  *Ross v. Corp. of Mercer Univ.*,

506 F. Supp. 2d 1325, 1361 (M.D. Ga. 2007) (rejecting Title IX retaliation claim because

plaintiff failed to show "that a retaliatory motive played a substantial part in prompting the

adverse action" where defendant merely did not take action after complaint).  Here, Doe has

alleged that CCC failed to take disciplinary action against Roe and her friends because he

complained about sexual harassment, however, Doe's own allegations show that CCC did not

---

[4] As the court explained in *University of Chicago*, "the fact that the conduct a plaintiff challenges turns out not to be sexual harassment in the legal sense does not necessarily undermine a retaliation claim. The wrong identified by a Title IX retaliation claim is the differential treatment of a complaint, whether or not the complaint turns out to have merit."  WL 4163960, at *9.

discipline Roe for her harassing activity, but CCC also did not discipline Doe for his harassing activity—making kissing noises at Roe.  (Compl. ¶ 44.)  These allegations demonstrate that CCC did not take action with respect to any harassment, not just harassment about which Doe complained.  In sum, Doe's retaliation claim fails because his Complaint contains no allegations regarding CCC's "retaliatory motive" for failing to discipline and no allegations plausibly connecting CCC's disciplinary inaction to his complaints of harassment.

Accordingly, the Court denies Doe's retaliation claim.

## III.    Counts IX-XII—Illinois Common Law Claims

### A.    Count IX-Promissory Estoppel Claim

In Count IX, Doe alleges a promissory estoppel claim.  "To bring a successful claim of promissory estoppel under Illinois law, a plaintiff must prove (and at the pleading stage, allege) that (1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on the promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment."  *Doe v. Univ. of Chicago*, WL 4163960, at *10 (citing *Quake Constr., Inc. v. American Airlines, Inc.*, 565 N.E.2d 990, 1004 (Ill. 1990).  Here, Doe alleges that he detrimentally relied on CCC's promises (1) to adjudicate Roe's false sexual misconduct allegations in accordance with CCC's policies and (2) to subject Roe and her friends to discipline for violating CCC's policies prohibiting retaliation against Doe, disclosure of confidential information, physical assault, and defamatory statements about Doe.

Despite Doe's claims, courts have rejected promissory estoppel claims containing similar allegations in Title IX cases, finding that the language in university policies does not constitute the type of unambiguous promise required to support a promissory estoppel claim. In *Doe v. University of Chicago*, WL 4163960, at *10, for example, the plaintiff, in addition to bringing a

Title IX claim after he was accused of sexual assault, also brought a promissory estoppel claim in which he alleged that the university promised to protect him from unlawful harassment and defamation, to adjudicate complaints in a fair and impartial manner, and to provide a prompt, fair, impartial, and thorough investigation consistent with its own policies and federal non-discrimination laws. The court found that the promises in the university's policy and procedure manual were not "definite enough to constitute an *unambiguous* promise" and instead reflected a general "commitment to broad principles of fairness and nondiscrimination without giving specifics about how those goals will be achieved." *Id.* The court reasoned that the context of the promises—in a student manual, which was subject to change "at the sole discretion of the University," and which stated that the policies were general enough to allow specific responses to unique situations—demonstrated both that the promises were not sufficiently unambiguous and that the plaintiff's reliance "would not have been expected or foreseeable to the university." *Id.* The court also noted that while a plaintiff may derive a promissory estoppel claim from a policy manual, those claims typically arise with specific promises made in the employment context, not the general claims made by a university in its manuals and policies. *Id.* at *11 (citing *Lawrence v. Bd. of Educ. of Sch. Dist.* 189, 503 N.E.2d 1201 (Ill. App. Ct. 1987)). *See also Doe v. W. New England Univ.*, 228 F. Supp. 3d 154, 182 (D. Mass. 2017) (finding that university's statements in relation to sexual misconduct hearing were not unambiguous promises); *Rolph*, WL 4174933, at *16 (rejecting promissory estoppel claim because disciplinary panel's statement that it "is responsible for conducting a fair, orderly, and expeditious hearing . . . is not a "clear and unambiguous promise" that would reasonably induce reliance.")

Here, as in *University of Chicago*, the broad statements in CCC's policy manual are not the type of unambiguous promises that can support a promissory estoppel claim. CCC's policy

manual reflects a general commitment to preventing discrimination and does not contain the type of unambiguous promises that would support a promissory estoppel claim. Further, like in *University of Chicago*, the context of the policy manual, which includes a provision allowing CCC "to modify or amend this Policy at any time," provides additional support that the manual does not provide specific, unalterable promises. (R. 1, Ex. B § XV.) In sum, the purported promises in CCC's student policies about its disciplinary proceedings are broad statements reflecting CCC's goals for fair hearings and non-discrimination compliance under Title IX—they are not the type of unambiguous promises that give rise to a promissory estoppel claim.

The cases Doe cites in support of his argument that CCC's promises were unambiguous are inapposite. Doe relies, for example, on *Lawrence v. Board of Education of School District 189*, 503 N.E.2d 1201, 1210–11 (1987), and *Brown-Wright v. East St. Louis School District 189*, 2016 IL App (5th) 150148-U. In *Lawrence*, however, the court allowed the plaintiff's promissory estoppel claim to stand where she had relied on a provision allowing merit pay for accumulated sick leave that was contained in her employment contract for 17 years. 503 N.E.2d at 1210–11; *see Brown-Wright*, 2016 IL App (5th) 150148-U (finding same). As the court explained in *University of Chicago*, citing *Lawrence*, specific promises from an employer to an employee, originally found in an employment contract, regarding the employee's payment, are far more unambiguous than the broad promises in a student manual, and these cases are thus not persuasive. Doe also cites to *Doe v. Brandeis University*, 177 F. Supp. 3d 561 (D. Mass. 2016). In that case, however, the court found that the plaintiff had sufficiently alleged a breach of contract and rejected the plaintiff's promissory estoppel claim, and thus, *Brandeis* is not applicable here. *Id.* at 612-13.

Accordingly, the Court denies Doe's promissory estoppel claim.

## B.    Count X—Negligence Claim

Doe also alleges a common law negligence claim against CCC.  "To claim common law negligence, a plaintiff must allege facts establishing a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach."  *Dolin v. SmithKline Beecham Corp.*, 62 F. Supp. 3d 705, 713–14 (N.D. Ill. 2014) (citing *Simpkins v. CSX Transportation, Inc.*, 965 N.E.2d 1092, 1096 (2012)).  Here, Doe claims that CCC owed Doe a duty to abide by its own policies, violated those policies by conducting unfair disciplinary proceedings and failing to discipline Roe and her friends, and these breaches caused Doe injuries.

CCC argues that Doe has failed to sufficiently allege that it had a duty of care to protect Doe from the harmful actions of Roe and her friends.  In Illinois, "the touchstone of [a] court's duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff."  *Simpkins*, 965 N.E.2d at 1097; *see also Vesely v. Armslist LLC*, 762 F.3d 661, 665 (7th Cir. 2014).  Whether a duty exists is a question of law for the court to decide.  *Id.*  "Ordinarily, a party owes no duty of care to protect another from the harmful or criminal acts of third persons."  *MacDonald v. Hinton*, 836 N.E.2d 893, 898 (2005) (citations omitted).  Courts, however, recognize exceptions to that rule, including that a duty can arise "when the parties are in a special relationship and the harm is foreseeable."  *Id.*

As an initial matter, in several different contexts, courts have consistently found that the university-student relationship is not the type of "special relationship" such that the university has a duty to protect students from the harmful acts of third parties.  In *Weckhorst v. Kansas State University*, 241 F. Supp. 3d 1154, 1179–80 (D. Kan. 2017), *motion to certify appeal*

*granted,* No. 16-CV-2255-JAR-GEB, 2017 WL 3701163 (D. Kan. Aug. 24, 2017), for example, the plaintiff alleged that multiple students raped her at a fraternity party. With respect to her negligence claim against the university, the court explained that the plaintiff had to plead that a "special relationship" existed between the university, the plaintiff, and the assailants. *Id.* at 1179. The court rejected the plaintiff's argument that the university's control of the fraternity system, where the incident took place, gave rise to a duty of care and found that "relationships between [the university], [the] [p]laintiff, and the alleged assailants [did] not give rise to a legal duty owed to [the] [p]laintiff." *Id.* at 1179-80. *See also Freeman v. Busch*, 349 F.3d 582, 587–88 (8th Cir. 2003) ("[S]ince the late 1970s, the general rule is that no special relationship exists between a college and its own students because a college is not an insurer of the safety of its students"); *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 666–67 (W.D. Tex. 2017), *motion to certify appeal denied,* No. 6:16-CV-173-RP, 2017 WL 1628994 (W.D. Tex. May 1, 2017) (rejecting negligence claim because university did not have a duty to protect students from harmful acts of other students); *Rabel v. Illinois Wesleyan Univ.*, 514 N.E.2d 552, 560 (1987) ( rejecting negligence claim because "university, by its handbook, regulations, or policies [had not] voluntarily assumed or placed itself in a custodial relationship with its students, for purposes of imposing a duty to protect its students from [injuries]").

Moreover, in cases similar to this one, courts have also specifically rejected negligence claims by students claiming they were wrongly disciplined for sexual assault and that the university did not properly apply its policies. In *Austin v. University of Oregon*, 205 F. Supp. 3d 1214, 1229 (D. Or. 2016), for example, a group of male students alleged that they were wrongfully disciplined for sexual misconduct and asserted a negligence claim against their university based on its allegedly flawed disciplinary process. The court rejected their negligence

claim finding that the university did not owe a duty to students accused of sexual assault because they did not have the required special relationship and because the university's goal was to reach just code of conduct decisions rather than protect the interests of any particular student. *Id.* Similarly, in *Doe v. Amherst College*, 238 F. Supp. 3d 195, 228 (D. Mass. 2017), Amherst College expelled a male student for violating the university's sexual misconduct policy and the student brought a Title IX claim as well as a negligence claim based on allegedly biased disciplinary proceedings. The court rejected his negligence claim because the university did not have a legal duty "be owed directly to students, relating to the implementation of student disciplinary proceedings." *Id. See also Doe v. Trustees of Boston Coll.*, No. 15-CV-10790, 2016 WL 5799297, at *28 (D. Mass. Oct. 4, 2016) (rejecting negligence claim for unfair disciplinary proceedings relating to sexual assault because university does not owe duty of care to students in relation to disciplinary proceedings).

Instead of addressing this case law, Doe merely asserts that CCC had a duty based on its policies, and cites to one case, *Dawson v. United States*, No. 16-CV-00827, 2017 WL 977822, at *1 (S.D. Ill. Mar. 14, 2017). *Dawson*, however, is not applicable in this case because it involved a hospital's duty of care for its patients and the court in that case did not consider a university's duty to its students. Here, based on Illinois precedent, as well as the persuasive case law from other jurisdictions discussed above, the Court finds that CCC does not have a "special relationship" with its students such that a duty arose to protect Doe from the harmful acts of third parties, such as Roe and her friends. *See, e.g.*, *Freeman v. Busch*, 349 F.3d 582, 587–88. The Court also finds that CCC does not owe a duty to its students "relating to the implementation of student disciplinary proceedings." *Amherst Coll.*, 238 F. Supp. 3d at 228; *see also Rabel*, 514 N.E.2d at 560 (university policies do not create duty towards students).

Accordingly, the Court dismisses Doe's negligence claim.

**C.      Counts XI and XII—Infliction of Emotional Distress Claims**

Doe alleges both negligent infliction of emotional distress and intentional infliction of emotional distress.  The Court addresses each claim in turn.

### 1.      Intentional Infliction of Emotional Distress

To state a claim of intentional infliction of emotional distress ("IIED"), a plaintiff must allege that (1) the defendant's conduct was "extreme and outrageous;" (2) the defendant either intended that his conduct inflict severe emotional distress or knew that there was at least a high probability that his conduct would cause severe emotional distress; and (3) the defendant's conduct in fact caused severe emotional distress.  *Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 63 (Ill. 2016), *reh'g denied* (Mar. 27, 2017).  "Run-of-the mill annoyances and oppressions do not constitute "extreme and outrageous" conduct.  *Doe v. Univ. of Chicago*, 2017 WL 4163960, at *11.  The offending conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Schweihs*, 77 N.E.3d at 63 (citing Restatement (Second) of Torts § 46 cmt. d, at 73 (1965)).

Given the high standard for showing extreme and outrageous conduct, several courts have rejected IIED claims in cases similar to this one, even where they found that the plaintiff had sufficiently alleged a Title IX claim.  In *Doe v. The Trustees of the University of Pennsylvania*, No. CV 16-5088, 2017 WL 4049033, at *15-17 (E.D. Pa. Sept. 13, 2017), for example, the court denied the defendant's motion to dismiss the plaintiff's Title IX erroneous outcome and selective enforcement claims and found that the plaintiff had sufficiently alleged gender bias and an effort by the university to hold males accused of sexual assault responsible.

The plaintiff also alleged that university officials intentionally inflicted emotional distress upon him by distorting facts relating to the alleged sexual assault, improperly attacking his credibility, and unjustifiably branding him a rapist. *Id.* at *19. Despite having allowed the plaintiff's Title IX claim to survive, the court rejected his IIED claim finding that even if the university officials' conduct was objectionable, it was not the type of extreme conduct beyond the "bounds of decency" such that it would give rise to an intentional infliction claim. *Id.*

Similarly, in *Nungesser*, 169 F. Supp. 3d at 375, the court rejected the plaintiff's IIED claim because he had not alleged conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." The court explained that although the plaintiff disagreed with how the university handled his sexual assault case and female students' activism on campus, he had not plausibly alleged any conduct that was extreme and outrageous. *Id.* The court further reasoned that the plaintiff had not alleged any facts indicating that the university officials intended to cause him any distress. *Id. See also Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 247 (D. Vt. 1994) ("A College's decision, when confronted with a female student's accusation of rape, to confront the male student with the charges, hold a hearing, and support the findings of the initial tribunal on appeal, even where various procedural errors are alleged, cannot form the basis of an IIED claim.")

Here, Doe has simply not alleged conduct that was extreme or outrageous enough to support an IIED claim. Doe makes the boilerplate allegation that CCC's conduct was extreme and outrageous and that it intended to inflict severe emotional distress, but Doe's allegations do not state that CCC's conduct was extreme or outrageous or that it was intended to inflict emotional harm upon Doe. Doe may disagree with the findings of the Hearing Panel and CCC's application of its procedures, but his allegations make clear that CCC officials consistently

responded to his communications, informed him of its policies, gave him a hearing with an adviser, considered his appeals, and responded to his complaints about other students by contacting those students and instructing them to cease their communication with Doe. (Compl. ¶¶ 62-63, 41-42, 45-47.) Simply put, even if the Court were to accept that CCC's resolution of Roe's sexual assault complaint was unfair or unreasonable, Doe does not allege conduct that constitutes the type of extreme, targeted, and malicious conduct required for an IIED claim. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 617 (D. Mass. 2016) ("Although [the university's] actions in [plaintiff's] case may have been unreasonable and unfair," the facts "do not appear to constitute the sort of targeted, deliberate, and malicious conduct that is required for an IIED claim.")

Accordingly, the Court grants CCC's motion to dismiss Doe's IIED claim.

### 2. Negligent Infliction of Emotional Distress

Plaintiff also asserts a claim for negligent infliction of emotional distress ("NIED"). "Under Illinois law, for a direct victim to state a claim of negligent infliction of emotional distress, he must allege: (1) that defendant owed plaintiff a duty; (2) that defendant breached that duty; and (3) that plaintiff's injury was proximately caused by that breach." *Harris v. United States*, No. 13-CV-8584, 2017 WL 770969, at *6 (N.D. Ill. Feb. 28, 2017). Additionally, in Illinois, the plaintiff must show that he suffered a physical impact or injury that was contemporaneous with the defendant's negligent conduct. *Schweihs,* 77 N.E.3d at 59. Here, Doe's NIED claim fails for the same reason that his negligence claim fails—he has failed to allege that CCC was negligent because he did not sufficiently allege that CCC owed Doe a duty to protect him from the harmful acts of third parties or that CCC owed Doe a duty under its policies and student manuals.

Accordingly, the Court grants CCC's motion to dismiss Doe's NIED claim.

## CONCLUSION

For these reasons, the Court grants CCC's Rule 12(b)(6) motion to dismiss without prejudice. Plaintiff has leave to file an Amended Complaint on or before November 15, 2017.

**Dated:** October 25, 2017

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**